**COMMONWEALTH of Pennsylvania,**
**Appellant**

v.

**Andre Edward BASKING, Appellee.**

Superior Court of Pennsylvania.

Argued Jan. 13, 2009.

Filed April 14, 2009.

Sandra Preuhs, Asst. Dist. Atty., for Com., appellant.

Lee M. Rothman, Pittsburgh, for appellee.

BEFORE: FORD ELLIOTT, P.J., LALLY–GREEN and ALLEN, JJ.

OPINION BY ALLEN, J.:

¶ 1 In this case, we are asked to explore the contours of the common authority and apparent authority doctrines, which are corollaries to the consent exception to the warrant requirement.[1] Additionally, this Court must decide if the apparent authority exception, if adopted and applied to the citizens of this Commonwealth, violates the strong notion of privacy inherent in Article I, Section 8 of the Pennsylvania Constitution.

¶ 2 The Commonwealth appeals from the trial court's order granting Andre Basking's ("Basking") motion to suppress, finding that the police search of Basking's living quarters was unconstitutional under Article I, Section 8 of the Pennsylvania Constitution. On appeal, the Commonwealth, *inter alia,* asserts that the trial court erred in finding that the third-party consent to search in this case was impermissible. The Commonwealth further contends that the trial court erred in concluding that the third-party consent, although valid pursuant to the apparent authority doctrine for purposes of the Fourth Amendment, nonetheless infringed Basking's rights under Article I, Section 8. Upon review, we find the Commonwealth's argument meritorious. Accordingly, we reverse the trial court's order and remand for proceedings consistent with this Opinion.

¶ 3 The trial court aptly summarized the facts of this case as follows.

The facts of this case demonstrate that on November 13, 2005, Officer [Sean] Rattigan of the City of Pittsburgh Police Department was dispatched to 6526

---

1. In general, the common authority doctrine permits a third-party possessing common authority over a premise to give valid consent to search against a non-consenting person who shares authority because "it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The apparent authority doctrine allows a third-party to consent to a search, even if the third-party does not have common authority over a premise, where an officer reasonably believes, based upon the facts then available, that the consenting third-party had the authority to consent. *Illinois v. Rodriguez,* 497 U.S. 177, 188–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

Meadow Street, Pittsburgh, Pennsylvania for a domestic call. When he arrived at the scene, Officer Rattigan observed an adult female sitting on an outside wall. The female was crying and she was accompanied by two young children at the time. Upon being questioned by Officer Rattigan, the female indicated that [Basking] had assaulted her and during the incident [Basking] fired "two rounds at her." The female advised Officer Rattigan that [Basking] was last seen running into the residence located at 6526 Meadow Street. The City of Pittsburgh "Special Emergency Response Team" or "SERT" was also dispatched to the scene as well. Officer Rattigan did not personally observe [Basking] at that residence. However, shortly after being on the scene, Officer Rattigan was advised, over the police radio, that [Basking] had turned himself in to the police at the Zone 5 Police Station.

After [Basking] was in custody, law enforcement officers decided to conduct a search of the house [located at 6526 Meadow Street] for the weapon used by [Basking] in the assault. The SERT term entered the house first and conducted a sweep of the house to ensure that no other persons were in the house prior to [initiating] a search[.] At some point, Officer Rattigan advised [Basking's] mother, [Leslie Nunley], who owned the house, that he wanted to search the house for the weapon alleged to have been used by [Basking.] [Nunley] did permit a search of the house but requested that she be permitted to accompany the law enforcement officers during the search. During the search of the third floor, the officers found heroin and weapons as well as some other incriminating evidence.

Trial Court Opinion (T.C.O.), 1/25/08, at 2–3.

¶ 4 On April 4, 2006, the Commonwealth charged Basking with counts of drug possession offenses, receiving stolen property, and illegal possession of a firearm. In turn, Basking filed an omnibus pre-trial motion to suppress, asserting, *inter alia,* that the police obtained the contraband in violation of the consent exception to the warrant requirement. Specifically, Basking maintained that Nunley did not possess actual or apparent authority to consent to a search of the third floor under both the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

¶ 5 At the suppression hearing, Officer Rattigan testified that Nunley was Basking's mother and that she owned the Meadow Street residence. R.R. at 19, 43–44, 57. Officer Rattigan stated that he told Nunley that Basking may have hidden the firearm inside the residence and asked for her consent to look for it. R.R. at 19a. After procuring Nunley's consent, the police, accompanied by Nunley, searched the first and second floors of the residence. R.R. at 19, 41–42. Nunley informed the police that if they were going to find anything, it would be on the third floor because that's were Basking stayed. R.R. at 42. Officer Rattigan testified that the door leading to the third floor was unlocked, and Nunley escorted him up to the third floor. R.R. at 19–20. While Officer Rattigan searched the third floor, Nunley told him: "If there's anything in here, I want it out." R.R. at 25. Officer Rattigan ultimately confiscated contraband and concluded his search. R.R. at 25.

¶ 6 During the suppression hearing, Nunley testified that Basking, a 20 year-old male, resided on the entire third floor of the residence. R.R. at 51–52. Nunley also testified to facts that she did not disclose to Officer Rattigan during the search. Particularly, Nunley stated that

Basking paid her $100 in monthly rent and that they entered into an agreement that nobody in the house was permitted access to the third floor. R.R. at 51–52. Nunley further testified that Basking always kept the door leading to the third floor closed and that she hasn't been up to the third floor in years. R.R. at 53–54, 64. When asked on cross-examination why she didn't reveal this information to Officer Rattigan, Nunley stated that she was "still traumatized" by the incident. R.R. at 71. The trial court found Nunley's testimony credible.

¶ 7 Following the hearing, the trial court granted Basking's motion to suppress. The trial court concluded that Nunley did not have actual authority to consent to a search of the third floor because she and Basking entered into a landlord-tenant relationship and, consequently, Nunley did not share common authority over Basking's living quarters. *Id.* at 5. The trial court, however, found that under the totality of the circumstances, the police reasonably believed that Nunley possessed common authority to consent to a search of Basking's room. *Id.* at 7. Therefore, the trial court ruled that Officer Rattigan's search of the third floor was permissible under the Fourth Amendment. *Id.*

¶ 8 Nonetheless, in deciding Basking's suppression motion, the trial court noted that the protections afforded under the Fourth Amendment do not necessarily parallel those of Article I, Section 8. *Id.* (citing *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991)). Analyzing the factors enunciated in *Edmunds* to determine whether Article I, Section 8 provides greater rights than the Fourth Amendment in this case, the trial court pointed to the unique history of Article I, Section 8 and its heightened emphasis on the privacy rights of the individual. T.C.O., 1/25/08, at 9–15. The trial court also found the *Edmunds* decision persua-

sive; in that case, our Supreme Court held that under Article I, Section 8, the fruits of a search could not be validated on the ground that the police relied in good faith on a defective search warrant, even though the United States Supreme Court concluded that the fruits of such a search were admissible as an exception to the exclusionary rule for Fourth Amendment purposes. *Id.* at 15. Analogizing the holding in *Edmunds* to the instant case, the trial court found it "illogical" to permit an officer to rely on the apparent authority of a third party where the officer reasonably believes the consent is valid, when it is unconstitutional under Article I, Section 8 for an officer to rely, in good faith, on a defective search warrant that is demonstrated to be unsupported by probable cause. *Id.* at 15. In further support of its position, the trial court cited case law from our sister states that have concluded the apparent authority exception was incompatible with their states' respective constitutions. *Id.* at 16–20.

¶ 9 In addition, the trial court recognized our Supreme Court's plurality decision in *Commonwealth v. Hughes*, 575 Pa. 447, 836 A.2d 893 (2003) (opinion announcing the judgment of the court), which adopted the apparent authority exception as a matter of state constitutional law, but noted that *Hughes* only applied to parolees, who have a diminished expectation of privacy. *Id.* at 6. In addressing policy considerations, the trial court stated that if the apparent authority doctrine were adopted in this Commonwealth and applied to ordinary citizens, it would permit someone who does not have actual authority to effectively waive another person's privacy rights by consenting to a search of that person's property. *Id.* at 21. The trial court also expressed its concern that the apparent authority doctrine, in allowing an officer to conduct a search based solely upon a reasonable belief, would provide

the officers with the "negative incentive . . . to take [no] further measures to determine whether actual authority to consent [ ] exists, especially in cases where there is no exigency." *Id.* For these reasons, the trial court found that in the absence of exigent circumstances, application of the apparent authority doctrine to the citizens of this Commonwealth would frustrate the strong notion of privacy inherent in Article I, Section 8. *Id.* at 16. Accordingly, on May 17, 2007, the trial court granted Basking's motion to suppress, concluding that Officer Rattigan's search of the third floor was unconstitutional under Article I, Section 8.

¶ 10 The Commonwealth now appeals to this Court,[2] raising the following issues for review:

I. Whether the court erred in finding that Leslie Nunley did not have actual authority to consent to a police search of her residence, including the third floor of that residence, defendant/appellee's room, which was not separately secured?

II. Whether the court erred in concluding that the Pennsylvania Supreme Court would interpret the apparent authority exception more narrowly under Article I, Section 8 of the Pennsylvania Constitution than it has been interpreted under the Fourth Amendment?

III. Having concluded that the police reasonably believed Leslie Nunley had authority to consent to the search of the premises, whether the court erred in finding that the concept of apparent authority can-

not be used to justify a search absent exigent circumstances?

Brief for Appellant at 4.

■■■■ ¶ 11 We employ the following standard of review when considering the Commonwealth's appeal from an order granting a motion to suppress:

Where a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. In reviewing the ruling of a suppression court, our task is to determine whether the factual findings are supported by the record. If so, we are bound by those findings. Where, as here, it is the Commonwealth who is appealing the decision of the suppression court, we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted. Moreover, if the evidence when so viewed supports the factual findings of the suppression court, this Court will reverse only if there is an error in the legal conclusions drawn from those findings.

*Commonwealth v. Hill,* 874 A.2d 1214, 1216 (Pa.Super.2005) (citations omitted).

¶ 12 In its first issue, the Commonwealth contends that the trial court erred in concluding that Nunley did not possess actual or common authority to consent to a search of the third floor. Brief for Appellant at 28–31. Specifically, the Commonwealth focuses on the fact that Nunley was Basking's mother and that she owned the

---

**2.** It is well-settled that when a trial court grants a defendant's motion to suppress, the Commonwealth has a right to appeal the suppression order, if the Commonwealth asserts in good faith that the court's order substantially handicaps or effectively terminates the prosecution for lack of evidence. *Common-*

*wealth v. Wallace,* 953 A.2d 1259, 1260 n. 1 (Pa.Super.2008). Here, the Commonwealth has certified in good faith that the trial court's order granting Basking's motion to suppress terminates or substantially handicaps its ability to prosecute Basking. *See* Commonwealth's Notice of Appeal, 6/08/07.

residence. *Id.* at 28. The Commonwealth asserts that when Nunley became aware that there may be a gun in her house, her actions in directing and accompanying Officer Rattigan to the third floor can "only be characterized" as an exercise in actual authority. *Id.* The Commonwealth also points to Nunley's testimony stating that she feared for the safety of her other children and asks this Court to infer "that there was some likelihood" these children had access to the third floor. *Id.* Ultimately, the Commonwealth posits that in permitting the search of the third floor, Nunley chose to implement her superior authority over the premises, in order to assure the removal of contraband, and her conduct acted to "trump" Basking's rights of privacy in the third floor. *Id.* at 30. We disagree. The Commonwealth's argument ignores the trial court's factual findings and Nunley's testimony regarding Basking's exclusive use of the third floor.

¶ 13 The United States Supreme Court has held that a third party has actual authority to consent to a search if he/she "possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Matlock*, 415 U.S. at 171, 94 S.Ct. 988. The *Matlock* Court described "common authority" as follows:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that

one of their number might permit the common area to be searched.

*Id.* at n. 7 (citations omitted).

¶ 14 In the context of the parent-child relationship, LaFave notes in his treatise on search and seizure that the power of a parent to consent to a search of the home derives not so much from the idea of common authority as it does from the status of parent. Wayne R. LaFave, Search and Seizure, Vol. III, Chap. 8, § 8.4(b), 282 (3d ed. 1996). LaFave states that "courts tend to recognize a superior right in the parents to keep the family home free of criminal activity." *Id.* at 285. The parents' general, "superior authority" over their own property, however, "does not alone establish a right on their part to intrude into an area in which, by established practice, their adult off-spring had been permitted to devote to his exclusive use." LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 8.4(b), p. 203 (4th ed. 2004). In this vein, the courts have interpreted *Matlock* and found that a parent had sufficient "common authority" over a child's room to consent to a search of the room where the parent was provided with equal access to the child's living quarters or the child failed to take steps to exclude the parent from his/her room. *See, e.g., United States v. Block*, 590 F.2d 535, 539–41 (4th Cir.1978); *State v. Swenningson*, 297 N.W.2d 405, 407–09 (N.D.1980); *State v. Harris*, 642 A.2d 1242, 1247 (Del.Super.Ct.1993); *State v. Douglas*, 204 N.J.Super. 265, 498 A.2d 364, 371–72 (App. Div.1985) (collecting cases).

¶ 15 This Court has held that the concept of common authority "is based on mutual use of the property rather than a mere property interest." *Commonwealth v. Gutierrez*, 750 A.2d 906, 910 (Pa.Super.2000); *see Commonwealth v. Silo*, 480 Pa. 15, 389 A.2d 62, 66 (1978) (stating that joint access and control to appellant's

clothing was not akin to the right to mutual use of the clothing). As a result, "common authority is not implied by a mere property interest such as that of a landlord." *Commonwealth v. Davis*, 743 A.2d 946, 952 (Pa.Super.1999). To this end, "a landlord or lessor cannot consent to search of a tenant's premises, regardless of the lessor's right to enter and inspect." *Id.* (collecting and discussing cases). Although a landlord may have the authority to enter and inspect the premises for maintenance reasons, this authority is "granted for a specifically limited purpose, and does not equate to 'common authority' over the apartment for Fourth Amendment purposes." *Id.* Therefore, in general, a landlord does not have common authority to consent to a search of the premises occupied by a tenant because a landlord typically does not enjoy the rights of mutual use and enjoyment.

¶ 16 In *United States v. Austin*, 1996 WL 109500, 1996 U.S.App. LEXIS 8256 (6th Cir.1996), the Court of Appeals for the Sixth Circuit addressed the specific issue of whether a parent has common authority to consent to a search of an adult-child's bedroom where the adult-child paid rent. The *Austin* court noted that the adult-child was twenty-five years old, lived on the third floor of the house and paid rent, which was unknown in terms of amount and consistency in payment. *Id.* at **3–4, 1996 U.S.App. LEXIS 8256 at *10. The court found it particularly significant that there were no locks or other obstacles preventing access to the third floor and that the adult-child's parents frequently entered the room and searched for drugs because they thought it was "a common practice for parents who had children at home." *Id.* The *Austin* court distinguished the case before it from cases holding that landlords could not consent to searches of rented premises on the basis that the adult-child's relationship with his parents was not an "arms-length rental

arrangement" but instead, was more like an "informal agreement." *Id.* at *4, 1996 U.S.App. LEXIS 8256at *11. Ultimately, the court held:

> Granted, Austin is 25 years old, and probably has a greater expectation of privacy than an eight-year old, but under the circumstances of this case, it is clear that Austin, whose bedroom was regularly searched by his mother, was living in the room subject to his parents' terms. As such, the consent of the owner of the house where Austin's bedroom was located was valid.

*Id.* Accordingly, the court's decision in *Austin* best stands for the general proposition that if an adult-child does not enter into a legitimate rental agreement with his parents, but simply contributes monetarily to household expenses, and the parents maintain regular access to the adult-child's room, then the parents have the common authority to consent to a search of that room.

¶ 17 Here, unlike *Austin*, the record supports the trial court's conclusion that Basking entered into a definitive leasehold agreement with Nunley, paying $100 in rent per month. In contrast to *Austin*, Basking also entered into an agreement with Nunley that no other person in the household would be permitted to enter Basking's living quarters on the third floor. At the suppression hearing, Nunley testified that she had not gone up to the third floor in "years" and that when she wants to speak with Basking, she "call[s] up the steps and ask[s] for him." R.R. at 60–61, 64. Although Nunley was Basking's mother, this relationship, standing alone, does not establish that Nunley possessed common authority over the third floor, especially where, as here, Nunley's testimony established that Basking obtained exclusive possession of the third floor. In view of the above authorities, we

conclude that Basking's leasehold relationship with his mother, combined with the parties' conduct in regards to the third floor, sufficed to demonstrate that Nunley, in fact, did not have "mutual use" of the third floor and that Basking made adequate arrangements to exclude Nunley and the other members of the household from his room. The trial court, therefore, did not err in concluding that Nunley's consent was invalid under the common authority doctrine. *State v. Peterson,* 525 S.W.2d 599, 608–09 (Mo.App.1975) (finding that father did not have common authority to consent to search of son's room because the son paid rent and the evidence established that the room was "exclusively" the son's area and that "no one else had a right to be there."); *see United States v. Rith,* 164 F.3d 1323, 1330–31 (10th Cir. 1999) (stating that in a parent-child relationship, the presumption that a parent controls the premises can be rebutted by evidence that the defendant paid rent or entered into an agreement with the parents that they may not enter the child's room).[3] The Commonwealth's first issue fails.

¶ 18 In its second issue, the Commonwealth contends that the trial court erred in concluding that the apparent authority doctrine is narrower under Article I, Section 8 than it is pursuant to the Fourth Amendment. Before proceeding to the merits of the Commonwealth's argument, we will first determine if Officer Rattigan reasonably believed that Nunley possessed apparent authority to consent to a search under the Fourth Amendment. If Officer Rattigan did not have a reasonable belief, then we need not decide the issue of whether Article I, Section 8 provides more protection than the Fourth Amendment.

¶ 19 Our Supreme Court, in *Commonwealth v. Strader,* 593 Pa. 421, 931 A.2d 630, 634 (2007), formulated the apparent authority doctrine as follows:

Third party consent is valid when police reasonably believe a third party has authority to consent. Specifically, the apparent authority exception turns on whether the facts available to police at the moment would lead a person of reasonable caution to believe the consenting third party had authority over the premises. If the person asserting authority to consent did not have such authority, that mistake is constitutionally excusable if police reasonably believed the consenter had such authority and police acted on facts leading sensibly to their conclusions of probability.

*Id.* (citing *Rodriguez,* 497 U.S. at 186, 188–89, 110 S.Ct. 2793) (internal quotation marks omitted).

¶ 20 In *Commonwealth v. Blair,* 394 Pa.Super. 207, 575 A.2d 593, 598 (1990), this Court discussed the standard to be applied in determining whether a police officer reasonably believed that a person possessed apparent authority to consent:

[W]e are not allowing *carte blanche* consent entries into residences with the police officer being able to ratify his entry at a later date suppression hearing by merely stating that he was mistaken as to the actual authority of the consenting party. We hold that the police officer's reasonable mistake must be judged from an objective standard based on the totality of the circumstances. Although the police officer's state of mind is one fac-

---

**3.** We note that we are not confronted with the question of whether the common authority doctrine is compatible with Article I, Section 8 of the Pennsylvania Constitution. This issue is not raised on appeal and thus, is not currently before this Court. Our conclusion that Nunley did not possess common authority to consent rests solely on Fourth Amendment grounds.

tor to be considered in determining the reasonability of the mistake, it is not the only factor. Moreover, the police officer's mistake must be reasonable. In ambiguous situations, those situations which would cause a reasonable person to question the consenting party's actual authority or if the consenting party's assertions of authority appear unreasonable, a police officer should make further inquiries to determine the status of the consenting party. Reliance on a third party's bald assertion in such situations could subject any search to the remedy of the exclusionary rule.

*Id.* (footnote omitted).

¶ 21 In this case, Nunley owned the residence at 6526 Meadow Street, was Basking's mother, and provided Officer Rattigan with consent to search the premises. The police began searching the first two floors of the residence, when Nunley stated: "If you're going to find anything, its probably going to be on the third floor because that's where [Basking] stays." R.R. at 42. Accompanied by Nunley, Officer Rattigan proceeded to the third floor; the door leading to the third floor was not locked. During Officer Rattigan's search of the third floor, Nunley told him: "If there's anything in here, I want it out." R.R. at 25. Shortly thereafter, Officer Rattigan concluded his search of the third floor.

¶ 22 Based upon the totality of the circumstances, we conclude that the facts available to Officer Rattigan at the time of his search would lead a person of reasonable caution to believe that Nunley possessed apparent authority over the third floor. Nunley was Basking's mother, owned the residence, directed Officer Rattigan to the third floor, escorted Officer Rattigan to the third floor, and encouraged Officer Rattigan to search the third floor. From these facts, Officer Rattigan had ample reason to believe that

Nunley retained mutual use of the third floor, despite knowledge that it was the place where Basking, an adult-child, "stays." R.R. at 42a. Significantly, the door leading to the third floor was unlocked, and Officer Rattigan did not observe any circumstances to suggest that Basking preserved the room on the third floor as an enclave within the residence or had somehow undermined Nunley's access to-or authority over-the third floor. Although Officer Rattigan did not inquire as to whether Basking paid rent, on this record, we conclude that the surrounding circumstances evinced an unambiguous situation in which Officer Rattigan had no reason to doubt Nunley's apparent assertions of common authority. We hold, therefore, that Officer Rattigan reasonably (albeit mistakenly) believed that Nunley's consent to search was valid under the apparent authority doctrine. *See People v. Brooks,* 277 Ill.App.3d 392, 214 Ill.Dec. 79, 660 N.E.2d 270, 276 (1996) (finding that officer reasonably believed that mother possessed apparent authority to consent to search of son's room where there was no evidence the son had exclusive possession of his bedroom, and the mother did not tell the police that the son paid rent, locked the door in his absence, and had given instructions not to allow anyone to enter); *cf. Davis,* 743 A.2d at 952 n. 2 (finding that officer could not reasonably believe that a person identified as an "apartment manager" had apparent authority to consent to a search of a lessee's residence). *See also United States v. Almeida–Perez,* 549 F.3d 1162, 1172 (8th Cir.2008) ("Where a third party appears to have authority over the entire premises, the police may rely on that person's consent to search throughout the house, so long as the consent appeared to extend so far."). Consequently, Officer Rattigan's search of the third floor did not violate the Fourth Amendment.

¶ 23 Having concluded that Officer Rattigan reasonably believed that Nunley had apparent authority to consent to a search under the Fourth Amendment, we now determine whether application of the apparent authority doctrine to citizens of this Commonwealth violates the strong notion of privacy contained in Article I, Section 8.

¶ 24 Under certain circumstances, the Pennsylvania state constitution provides greater protection than the Constitution of the United States. *Commonwealth v. Moore*, 928 A.2d 1092, 1099 (Pa.Super.2007). In the seminal case, *Edmunds*, our Supreme Court explained that:

> here in Pennsylvania, we have stated with increasing frequency that it is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution each time a provision of that fundamental document is implicated. Although we may accord weight to federal decisions where they are found to be logically persuasive and well reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, we are free to reject the conclusions of the United States Supreme Court so long as we remain faithful to the minimum guarantees established by the United States Constitution.

586 A.2d at 894–95.

¶ 25 The litigants and courts of this Commonwealth are instructed to consider the following four factors when deciding whether the Pennsylvania Constitution affords greater protection than the Federal Constitution:

> 1) text of the Pennsylvania constitutional provision;
>
> 2) history of the provision, including Pennsylvania case-law;
>
> 3) related case-law from other states;
>
> 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.

*Id.* at 895. According to our Supreme Court, "it is unclear exactly how the *Edmunds* factors are evaluated. For example, it is uncertain if each factor is weighed evenly and what level of proof a party needs to show to prevail on a particular factor or the total analysis." *Commonwealth v. Chase*, 599 Pa. 80, 960 A.2d 108, 116 (2008).

¶ 26 The wording of Article I, Section 8 of the Pennsylvania Constitution is almost identical to that of the Fourth Amendment. *Commonwealth v. Matos*, 543 Pa. 449, 672 A.2d 769, 772 (1996).[4] Given the similarity between Article I, Section 8 and the Fourth Amendment, the finding of a privacy-based, broader state constitutional right derives from the case law interpreting the history of the Pennsylvania provision and not from any textual command. *Commonwealth v. Glass*, 562 Pa. 187, 754 A.2d 655, 662 n. 11 (2000). Although Article I, Section 8 and the Fourth Amendment are similar in wording, our Supreme Court, relying on interpretive case law, has

---

4. The text of Article I, Section 8 provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. art. I, § 8. The text of the Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

concluded that Article I, Section 8 embodies an enhanced notion of privacy. *Edmunds*, 586 A.2d at 898 ("[A] steady line of case-law has evolved under the Pennsylvania Constitution, making clear that Article I, Section 8 is unshakably linked to a right of privacy in this Commonwealth."); *see Commonwealth v. Hawkins*, 553 Pa. 76, 718 A.2d 265, 269 (1998) ("The polestar of the expanded protection afforded by Article I, Section 8, which distinguishes it from its federal counterpart, is its emphasis upon personal privacy interest."). Consequently, our Supreme Court has held that Article I, Section 8, in particular situations, provides greater protection than the Fourth Amendment because the core of its exclusionary rule is grounded in the protection of privacy while the federal exclusionary rule is grounded in deterring police misconduct. *Commonwealth v. Williams*, 547 Pa. 577, 692 A.2d 1031, 1038 (1997).

¶ 27 Although Article I, Section 8 implies a strong notion of privacy, the right to privacy under the Pennsylvania Constitution is not unlimited. *Moore*, 928 A.2d at 1100. Our Supreme Court has cautioned that standing alone, this basic entitlement to privacy "does not command a reflexive finding in favor of any new right or interpretation asserted." *Commonwealth v. Smith*, 575 Pa. 203, 836 A.2d 5, 15 (2003). In appropriate circumstances, our Supreme Court has not hesitated to follow the prevailing Fourth Amendment standard. *Id.* (citing *Commonwealth v. Cleckley*, 558 Pa. 517, 738 A.2d 427, 431–32 (1999) (collecting cases)). This Court will "construe the Pennsylvania Constitution as providing greater rights to its citizens than the federal constitution only where there is a compelling reason to do so." *Commonwealth v. Crouse*, 729 A.2d 588 (Pa.Super.1999) (quoting *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921, 926 (Pa.1985)).

¶ 28 In consideration of the foregoing legal principles, we conclude that the text and general interpretive history of Article I, Section 8 are, at best, neutral factors that do not weigh in favor of finding a broader state constitutional right in this case. The applicable texts of both Article I, Section 8 and the Fourth Amendment are identical in protecting against "unreasonable searches and seizures." *See Chase*, 960 A.2d at 117 (stating that due to the textual similarity between Article I, Section 8 and the Fourth Amendment, the text of Article I, Section 8, alone, does not demonstrate that a different standard should be applied under Article I, Section 8). Moreover, the general notion that the historical interpretation of Article I, Section 8 emphasizes a personal privacy right is, in and of itself, inadequate to establish that the Pennsylvania Constitution must, in every instance, afford greater protection than the Fourth Amendment. *Smith*, 836 A.2d at 15; *see Commonwealth v. Russo*, 594 Pa. 119, 934 A.2d 1199, 1207 (2007) (stating that although the appellant generally observes that the history of Article I, Section 8 establishes a desire to safeguard privacy, the appellant fails to relate this unique history to the specific issue of this case). As such, these factors do not support Basking's contention that adoption of the apparent authority doctrine would run counter to requirements of Article I, Section 8.

¶ 29 We now analyze the history of Pennsylvania case law interpreting the apparent authority exception, which is perhaps the most important part of an *Edmunds* inquiry. Our Supreme Court has instructed this Court to apply prevailing Fourth Amendment jurisprudence "where our own independent state analysis does not suggest a distinct standard." *Commonwealth v. Cleckley*, 558 Pa. 517, 738 A.2d 427, 431–32 (1999), *accord Common-*

*wealth v. Glass,* 562 Pa. 187, 754 A.2d 655, 660 (2000).

¶ 30 In *Hughes,* a plurality of our Supreme Court concluded that the apparent authority exception to the warrant requirement, as enunciated by the United States Supreme Court in *Rodriguez,* did not encroach upon the rights secured under Article I, Section 8. Rather, a plurality of our Supreme Court adopted the apparent authority exception as a matter of state constitutional law, at least in the context where it applied to parolees:

> In *Edmunds,* this Court addressed the question of whether Pennsylvania should adopt the 'good faith exception' to the exclusionary rule as articulated by the Supreme Court of the United States in *United States v. Leon,* 468 U.S. 897 [104 S.Ct. 3405, 82 L.Ed.2d 677] (1984). We refused to adopt this exception, determining that it would frustrate the guarantees embodied in Article I, Section 8 of our Constitution. However, there is no relationship between the 'good faith exception' that we addressed in *Edmunds* and the 'apparent authority exception.' The 'good faith exception' analyzed in *Edmunds* is based on the notion that illegally seized evidence obtained pursuant to a constitutionally defective search warrant does not need to be suppressed as long as the police officer acted in good faith upon the warrant issued by a neutral and detached magistrate. The adoption of the 'good faith exception' would have been inconsistent with Pennsylvania Rules of Criminal Procedure, and with the heightened expectation of privacy that the Constitution affords our citizens. Unlike *Edmunds,* there are no cases or rules suggesting that there is a distinction between the Pennsylvania and United States Constitutions with regard to consent to enter a premises. Rather, this Court has interpreted consent to enter a premises consistent with the interpretation of the United States Supreme Court. *See [Commonwealth v. Latshaw,* 481 Pa. 298, 392 A.2d 1301, 1305 (Pa.1978)].

> The 'apparent authority exception' stems from the 'third party consent to a search exception' to the exclusionary rule. When police officers obtain the voluntary consent of a third party, who has the authority to give consent, they are not required to obtain a search warrant based on probable cause. *Commonwealth v. Stanley,* [498 Pa. 326] 446 A.2d 583 (Pa.1982). A co-inhabitant of a residence does not have a reasonable expectation of privacy that society is willing to protect in the third party consent context. He or she should recognize that any of the co-inhabitants of the residence have the right to permit the inspection of the premises in their own right. Therefore, by virtue of living in a residence with other inhabitants, a co-inhabitant assumes the risk that one of the residents may permit the common area to be searched. The 'apparent authority exception' allows the admission of evidence where the police officers reasonably, and even mistakenly, relied upon the consent of a third party who did not have actual authority to consent to the search. The question of reasonableness is paramount to the functioning of this exception. . . .

> The Superior Court has adopted the 'apparent authority exception.' [ ] *see Commonwealth v. Quiles,* [422 Pa.Super. 153] 619 A.2d 291 (Pa.Super.1993); *Commonwealth v. Blair,* [394 Pa.Super. 207] 575 A.2d 593 (Pa.Super.1990), *appeal denied,* [526 Pa. 646] 585 A.2d 466 (Pa.1991). In adopting this exception, the Superior Court explained that this exception does not permit *carte blanche* searches based on consent. The reasonable mistake of the police officer must

be judged from an objective standard based upon the totality of the circumstances.

836 A.2d at 902–03 (footnotes and some citations omitted).

¶ 31 Relying on the critique of the *Hughes* plurality, we similarly conclude that the history of Pennsylvania case law does not suggest that a distinct standard should be applied in evaluating the apparent authority doctrine under the Pennsylvania and United States Constitutions.[5] As noted by the *Hughes* plurality, this Court originally adopted the apparent authority doctrine in *Blair*, shortly before the United States Supreme Court, in *Rodriguez*, and concluded that the doctrine passed muster under the Fourth Amendment. In *Quiles*, this Court implicitly found that the apparent authority exception withstood scrutiny under *Edmunds*, opining that an officer's reasonable belief that a third party has authority to consent is incomparable to an officer's reliance on a defective search warrant; ostensibly, this is because the former is a bona fide exception to the warrant requirement while the later implicates a limitation on the exclusionary rule. *See* 619 A.2d at 297 n. 4. Recently, in *Commonwealth v. Graham*, 949 A.2d 939, 943 (Pa.Super.2008), a panel of this Court applied the apparent authority doctrine to dispose of the defendant's claims under both the Fourth Amendment and Article I, Section 8, concluding that the officer in that case reasonably believed that a roommate had the apparent authority to consent to a search of a vehicle.

¶ 32 In short, Basking has failed to point to any Pennsylvania case law (and we cannot discover any) interpreting either Article 1, Section 8 or the Fourth Amendment, before or after *Rodriguez*, that suggests the apparent authority exception is an unacceptable legal doctrine. We view this absence of authority especially significant because in the cases where our Supreme Court has found a broader state constitutional right, there were often divergences in the case law of Pennsylvania and the United States Supreme Court, which served as the impetus for concluding that Article I, Section 8 affords more protection than the Fourth Amendment. *See, e.g., Matos*, 672 A.2d at 776 (rejecting the United State Supreme Court's definition of a "seizure" in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ("Thus, there exists clear precedent in Pennsylvania defining the appropriate standards to be used when considering whether an individual has been seized. The longstanding definition of what constitutes a seizure applied by the Courts of this Commonwealth cannot be ignored, particularly when viewed in tandem with this Court's recognition of the privacy rights embodied in Article I, Section 8."); *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896, 901–02 (1995) (rejecting the articulation of a warrantless search of an

---

**5.** Madame Justice Newman authored the lead opinion in *Hughes* and was joined by Justices Eakin and Castille. Chief Justice Cappy filed a dissenting opinion, joined by Justice Nigro, advancing the position that under the facts of the case, the police could not reasonably believe that the third parties had apparent authority to provide a valid consent. 836 A.2d at 906–08. Justice Saylor filed a concurring opinion, agreeing with Chief Justice Cappy's dissent, but alternatively finding that the police had reasonable suspicion to believe that the defendant violated his parole. *Id.* at 905.

Justice Lamb filed a concurring opinion in which he concluded that the police properly conducted a warrantless search of the defendant's property under state statute pertaining to a search of a parolee. *Id.* at 905–06.

Although the lead opinion in *Hughes* is nonbinding because it did not garner a majority of justices, we find that Madame Justice Newman's discussion on the apparent authority doctrine is instructive to the matter at hand and that its analysis is fundamentally sound. Accordingly, we adopt this portion of the *Hughes* opinion as our own. *Id.* at 900–03.

automobile in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768, (1981) under Article I, Section 8 because *Belton* altered the court's previous holding in *Commonwealth v. Timko*, 491 Pa. 32, 417 A.2d 620 (1980)); *Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457, 468 (1983) (relying on its previous decision in *Commonwealth v. Knowles*, 459 Pa. 70, 327 A.2d 19 (1974), to conclude that a defendant has "automatic standing" under Article I, Section 8 despite the United State Supreme Court's abandonment of the doctrine in *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980)). Accordingly, we conclude that the history of Pennsylvania case law weighs heavily against the conclusion that the apparent authority exception is incompatible with Article I, Section 8.

¶ 33 Turning to the related case law from other states, our research has revealed that a variety of high courts and intermediate appellate courts have decided, with or without meaningful discussion, whether the apparent authority doctrine violates their respective state constitutions.

¶ 34 Initially, we note that the high courts of Minnesota, Colorado and New Jersey have applied and/or adopted the apparent authority exception in deciding constitutional claims under both the Fourth Amendment and the constitutions of their states. *See State v. Licari*, 659 N.W.2d 243 (Minn.2003); *People v. Hopkins*, 870 P.2d 478 (Colo.1994); *State v. Maristany*, 133 N.J. 299, 627 A.2d 1066 (1993). These decisions, however, did not separately analyze the issue of whether the apparent authority exception is compatible with the states' respective constitutional provisions; rather, they apparently presumed it to be the case. In *Lee v. State*, 849 N.E.2d 602, 610 (Ind.2006), the Supreme Court of Indiana expressed a willingness to adopt the apparent authority

doctrine as being consistent with Article I, Section 11 of the Indiana State Constitution.

¶ 35 In *State v. Sawyer*, 147 N.H. 191, 784 A.2d 1208, 1212 (2001), and *State v. McCaughey*, 127 Idaho 669, 904 P.2d 939, 943–44 (1995), the Supreme Courts of New Hampshire and Idaho conducted a state constitutional analysis and concluded that the apparent authority exception did not violate the state constitutions of New Hampshire and Idaho. Notably, the operative portions of Part I, Article 19 of the New Hampshire Constitution and Article I, Section 17 of the Idaho Constitution are similar in wording to Article I, Section 8 of the Pennsylvania Constitution. In *Sawyer*, the high court of New Hampshire based its decision on the fact that the court previously held that its constitution was co-extensive with the Federal Constitution in determining the scope of a third-party's consent to search. 784 A.2d at 1212.

¶ 36 Conversely, in *State v. Morse*, 156 Wash.2d 1, 123 P.3d 832 (2005), *State v. McLees*, 298 Mont. 15, 994 P.2d 683 (2000), *State v. Lopez*, 78 Hawai'i 433, 896 P.2d 889, 901 (1995), *State v. Devonshire*, 2004 WL 94724, 2004 Del.Super. LEXIS 9 (Del.Super.Ct.2004), and *State v. Wright*, 119 N.M. 559, 893 P.2d 455 (App.1995), the courts declined to adopt the apparent authority exception as a matter of state constitutional law.

¶ 37 In assessing this authority, we place little weight on *Morse*, *McLees*, and *Lopez* because the Washington, Hawaii and Montana Constitutions contain wording dissimilar to Article I, Section 8 and provide an independent basis upon which the courts found a broader state constitutional right. For example, the text of Article I, Section 7 of the Washington Constitution is more encompassing than Article I, Section 8, namely as it pertains to the warrant requirements and exceptions, by stating

that: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Wash. Const. art. 1, § 7; *Morse,* 123 P.3d at 836 ("Under this provision, the warrant requirement is especially important as it is the warrant which provides the requisite 'authority of law.'"). Further, in contrast to Pennsylvania law, the Montana Supreme Court interprets its constitutional search and seizure provision in light of Article II, Section 10 of the Montana Constitution, which states: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." *McLees,* 994 P.2d at 688–89. Finally, unlike Article I, Section 8 of the Pennsylvania Constitution, Article I, Section 7 of the Hawaii Constitution expressly protects against "invasions of privacy" that is "enforceable by a rule of reason which *requires that governmental intrusions into the personal privacy of citizens of this State be no greater in intensity than absolutely necessary.*" 896 P.2d at 901–02 (emphasis in original). The absence of such language and underlying policy objectives in Article I, Section 8 ultimately detracts from Basking's reliance on *Morse, McLees,* and *Lopez* as persuasive support in his *Edmunds* claim. *See Russo,* 934 A.2d at 1211 (finding case law from other states unpersuasive in an *Edmunds* analysis because it relied on diverging state constitutional language).

¶ 38 In *Devonshire* and *Wright,* the intermediate appellate courts of Delaware and New Mexico discerned language in their state constitutions that were similar to Article I, Section 8. Consistent with our supreme court in *Edmunds,* the Supreme Courts of Delaware and New Mexico have previously rejected, on state constitutional grounds, the United States Supreme Court's decision in *Leon,* which adopted the good faith exception to the exclusionary rule. *See Devonshire,* 2004 WL 94724,

at **5–6, 2004 Del.Super. LEXIS 9, at **18–19; *Wright,* 893 P.2d at 460–61. The courts in *Devonshire* and *Wright* reasoned that since the good faith exception to the exclusionary rule was previously rejected on state constitutional grounds, it follows that *Rodriguez's* apparent authority doctrine should likewise be discarded. *Devonshire,* 2004 WL 94724, at **6–7, 2004 Del.Super. LEXIS 9, at **20–22 ("Although *Rodriguez* does not mention *Leon* and the cases reason differently, they are bookends. *Leon* provides a way around the warrant requirement, while *Rodriguez* provides a way around the consent exception to the warrant requirement."); *Wright,* 893 P.2d at 460–61. In short, the *Devonshire* and *Wright* courts found no meaningful distinction between the good faith exception to the exclusionary rule and a consent obtained from a person who did not, in fact, possess apparent authority to consent because both concepts are grounded in an officer's "mistake." As the *Devonshire* court stated:

> *Dorsey's* [the Delaware Supreme Court case holding that the good faith exception to the exclusionary rule is inconsistent with Delaware's Constitution] reasoning logically controls the outcome here. It did not matter in *Dorsey*[ *v. State,* 761 A.2d 807 (Del.2000) ] that an appropriate judicial officer had given the police a search warrant, which they reasonably believed was valid. The fact that the warrant turned out to be invalid established a Constitutional violation triggering Delaware's exclusionary rule. Here, the police had consent from someone who appeared to have authority and the police reasonably believed they had valid consent. But like the police in *Dorsey,* the police here were mistaken about the authority under which they acted. Just as the police had a defective warrant in *Dorsey,* the police had defective consent here. If a search conducted

under an invalid warrant is invalid, then a *fortiori* a search conducted under the consent exception to the warrant requirement cannot be valid unless valid consent is actually present.

*Id.* at **6–7, 2004 Del.Super. LEXIS 9, at **20–21, *accord Wright,* 893 P.2d at 460–61.

¶ 39 The trial court, citing *Edmunds,* embraced the rationale of the *Devonshire* and *Wright* courts in arriving at its conclusion that Article I, Section 8 affords broader protection than the Fourth Amendment, and Basking requests this Court to adopt it on appeal.

¶ 40 Countering the reasoning espoused in *Devonshire,* the Supreme Court of Idaho (which also rejected *Leon* on state constitutional grounds) concluded that the good faith exception and the apparent authority doctrine were separate and distinct legal theories. As the *McCaughey* court explained:

> The district court reasoned that *Rodriguez* was founded in part upon the *Leon* good faith exception principles, and that because Idaho did not follow these principles ... Idaho should not follow *Rodriguez.* The majority opinion in *Rodriguez* does not rely upon *Leon* good-faith principles. The thrust of the *Rodriguez* opinion was that the Fourth Amendment has not required that police and magistrate judges always be factually correct, but rather the proper focus is whether government conduct was objectively reasonable. *Rodriguez* applied these general principles to the consent search setting. The Supreme Court's reasoning was not dependent upon the existence of a good faith exception to the exclusionary rule. In fact, the only time the majority opinion mentioned "good faith" was in its example of a factually incor-

rect arrest (wrong person arrested) that nonetheless was held reasonable.

*McCaughey,* 904 P.2d at 944.

¶ 41 Upon review, we accept the conclusion of *McCaughey* as more persuasive than the rationale of *Devonshire* and *Wright* because *McCaughey* coincides with the spirit of existing Pennsylvania case law. In *Hughes,* a plurality of our Supreme Court found that "there is no relationship between the 'good faith exception' that we addressed in *Edmunds* and the 'apparent authority exception.'" *Hughes,* 836 A.2d at 902. Likewise, in *Quiles,* a panel of this Court found that application of the apparent authority exception did not contravene *Edmunds'* holding and that the apparent authority doctrine was distinguishable from the good faith exception. *See* 619 A.2d at 297 n. 4.

¶ 42 In reaching our decision, we note that an officer's good-faith reliance on a defective search warrant is an exception to the *exclusionary rule* (a judicially crafted rule of evidence), while an officer's reliance on a person's apparent authority to consent is an exception to the *warrant requirement* (substantive constitutional law). As such, the good-faith reliance exception concedes an illegal search (a mistake of law), but effectively excuses that illegality by holding that the resulting evidence is nonetheless admissible in court. The apparent authority doctrine, on the other hand, allows the police to conduct a valid search based on a reasonable belief that a person has the authority to consent (a mistake of fact). Therefore, the good faith exception, in essence, operates to cure an illegal search, while the apparent authority doctrine articulates the standard in which to achieve a valid search.

¶ 43 In *Edmunds,* our Supreme Court was also motivated by an increased concern for the privacy rights of the individual, noting that if a search warrant is defec-

tive at the outset, then any invasion into an individual's realm of privacy should not depend on whether an officer acted in "good faith" or "bad faith." *See id.* at 901 ("From the perspective of the citizen whose rights are at stake, an invasion of privacy, in good faith or bad, is equally as intrusive."). We believe that the *Hughes* plurality adequately dispelled any concern regarding an individual's implied right to privacy under Article I, Section 8. In bolstering its conclusion that the apparent authority doctrine is consistent with the strong notion of privacy in Article I, Section 8, the *Hughes* plurality pronounced:

> While we recognize that Article I, Section 8 of the Pennsylvania Constitution affords our citizens greater protections than the Fourth Amendment to the United States Constitution, we do not believe that requiring apparent authority alone is inconsistent with our Constitution. Article I, Section 8 provides that people must be free from unreasonable searches and seizures. Because the officers' belief that they obtained consent from a third party who had common authority over a premises must be reasonable for the 'apparent authority exception' to apply, police officers should not be required to obtain a search warrant based upon probable cause where they have apparent authority to conduct a search. A person's privacy rights are no more violated when a third party with actual authority to consent permits police officers to enter a residence than when a person at the house with apparent authority consents to the entry of the police officers into the premises.

836 A.2d at 904.

¶ 44 Although the *Hughes* plurality limited its holding to the situation where the defendant is a parolee, who, under established case law, has a diminished expectation of privacy under the Pennsylvania Constitution, we find that the above excerpt is applicable to the instant case. *See*

*id.* ("Nevertheless, we need not reach the question of whether the 'apparent authority exception' should be applied in situations involving average citizens because Appellant is a parolee and, consequently, he has a diminished expectation of privacy."). A fair reading of this passage, in the context of the opinion, indicates that the Court was discussing the privacy rights of the ordinary citizens of this Commonwealth. Given *Hughes* and this Court's decision in *Quiles*, we find that *Edmunds* is inapplicable to the matter at hand and that its holding cannot reasonably be extended to encompass the apparent authority doctrine.

¶ 45 In addressing the final *Edmunds* factor, Basking and the trial court articulate only one example of a "policy consideration" to support their view that the apparent authority doctrine is inconsistent with Article I, Section 8. According to the trial court:

> Allowing police officers to conduct a search based upon their reasonable belief that consent exists erases any incentive they would have to take further measures to determine whether actual authority to consent actually exists ... The proper incentive should be to obtain a warrant, not to provide a mechanism for the officer to potentially remain ignorant as to important facts that may be determinative of whether a third party possess the requisite authority to consent to a search.

T.C.O., 1/25/08, at 22; *see* Brief for Appellee at 17.

¶ 46 We disagree with the trial court's appraisal of the law. As noted *supra*, under prevailing Pennsylvania case law, "we are not allowing *carte blanche* consent entries into residences with the police officer being able to ratify his entry at a later date suppression hearing by merely stating that he was mistaken as to

the actual authority of the consenting party." *Blair*, 575 A.2d at 598. If an officer encounters an ambiguous situation and has reason to doubt the consenting party's actual authority, or if the consenting party's assertions of authority appear unreasonable, the officer has an affirmative duty to inquire further into the matter. *Id.* In order for the officer's belief to be reasonable, the officer will necessarily have to obtain enough information, through conversation and/or observation, to make a sound judgment call as to whether the consenting party has common authority over the premises. *See Hughes*, 836 A.2d at 902–03; *Blair*, 575 A.2d at 598; *see also United States v. Waller*, 426 F.3d 838, 846 (6th Cir.2005) ("If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, then warrantless entry is unlawful without further inquiry.") (citations and some internal quotations omitted).

¶ 47 Contrary to the trial court's position, we conclude that the standard used to evaluate an officer's belief of apparent authority is practical and evidences a reasonable balance between the state's interest in preventing crime and an individual's interest in privacy. *See Hughes*, 836 A.2d at 902–04; *Blair*, 575 A.2d at 598 ("Although we could require police officers to secure both actual and apparent authority before entering a residence, we do not believe the police should have to institute an action for declaratory judgment to determine the authority of the third party or individual giving consent to enter or search."). As Basking advances no other policy arguments in support of his position, the final *Edmunds* factor does not weigh in his favor.

¶ 48 In view and consideration of the *Edmunds* factors, we hold that the apparent authority exception to the warrant requirement does not frustrate the notion of privacy implicit in Article I, Section 8. Accordingly, we adopt the apparent authority exception as a matter of state constitutional law, concluding that the rights secured by Article I, Section 8 are no greater than those provided under the Fourth Amendment. Because Officer Rattigan reasonably believed that Nunley possessed apparent authority to consent to a search of her residence, the search was valid under both the Fourth Amendment and Article I, Section 8. Therefore, the trial court erred in granting Basking's motion to suppress.

¶ 49 Due to our resolution of the Commonwealth's second issue, we decline to entertain its third and final issue.

¶ 50 For the above-stated reasons, we reverse the trial court's order and remand for proceedings consistent with this Opinion.

¶ 51 Order REVERSED. Case REMANDED. Jurisdiction RELINQUISHED.