J-A12042-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
                                           :          PENNSYLVANIA
                                           :
            v.                               :
                                           :
                                           :
BRADLEY JAY TRUETT                  :
                                           :
            Appellant            :       No. 1190 MDA 2020

Appeal from the Judgment of Sentence Entered January 17, 2020
In the Court of Common Pleas of Franklin County Criminal Division at
No(s): CP-28-CR-0000865-2015

BEFORE: LAZARUS, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:           **FILED AUGUST 02, 2021**

Bradley Jay Truett ("Truett") appeals from the judgment of sentence imposed following his conviction of drug delivery resulting in death ("DDRID"), delivery of heroin, and criminal use of a communication facility.[1] We affirm.

In its Opinion and Order denying Truett's Omnibus Pre-Trial Motion, the suppression court set forth its Findings of Fact as follows:

> On July 23, 2014, Detective Travis Carbaugh [("Det. Carbaugh")] of the Waynesboro Police Department was called to the scene of an apparent overdose death at 347 Viewpoint Way, Borough of Waynesboro, Franklin County. The decedent was Byron Rock [("Rock")].
>
> Upon searching the residence where [Rock's] body was found, the police recovered a cellular telephone. The phone was located in the bedroom with [Rock's] body. The police seized the phone; through subsequent investigation it was determined that the cell phone belonged to [Rock]. Det. Carbaugh searched the

---

[1] 18 Pa.C.S.A. §§ 2506(a), 7512(a); 35 P.S. § 780-113(a)(30).

contents of the phone in an effort to discover any information relating to the source of the controlled substances that apparently caused [Rock's] death. Det. Carbaugh did not seek the consent of the next of kin of [Rock,] nor did he obtain a search warrant prior to searching the phone. Information [*i.e.*, text messages from a phone number associated with Truett,] contained in the phone led Det. Carbaugh to suspect [Truett] was the source of the drugs that caused [Rock's] death.

Through his investigation, Det. Carbaugh developed a possible address where [Truett] was residing; the address was 147 W. North Street in the Borough of Waynesboro. Det. Carbaugh had been attempting to locate [Truett] at this time. On August 28, 2014, Det. Carbaugh traveled to the W. North Street location and observed a notice posted on the door of the residence in relation to eviction proceedings. At the time Det. Carbaugh arrived[,] the door was closed. However, the property manager (hereinafter "[the] landlord") … was inside the subject residence.

Det. Carbaugh spoke with the landlord. She advised Det. Carbaugh that [Truett's] name was not on the lease and he did not have permission to reside there. She further advised that she had initiated eviction proceedings against the leaseholder, Laura Jewel [("Jewel")], and that the property had been abandoned.[FN 1] This was consistent with Det. Carbaugh's belief that [Truett] was evading law enforcement.[FN 2] The landlord believed she had authority over the property at the time Det. Carbaugh spoke with her, and she granted him permission to enter and search the residence. Det. Carbaugh entered the residence and searched it; there was evidence in the residence that Det. Carbaugh seized and the Commonwealth intend[ed] to use at trial.[FN 3]

---

[FN 1] [The landlord] testified that, at some point prior, she had received a phone call from Children and Youth Services [("CYS")] asking where [] Jewel's children were; Jewel had four children that were permitted to reside with her on the lease. In response to the CYS phone call, [the landlord] went to the property and observed that "everything was gone" and "they had left." However, she discovered the oldest of Jewel's children inside the residence, and the landlord advised her that she could remain in the residence without Jewel residing there. According to the landlord, the child had climbed into the residence through an unlocked upstairs window.

[FN 2] Det. Carbaugh had "staked out" the residence in the week or two prior to August 28, 2014, in an effort to locate [Truett]. He watched the residence for approximately an hour[,] two or three times over the course of a week; during his times watching the residence, Det. Carbaugh observed no person or other activity connected to the residence that suggested anyone was residing there. Indeed, Det. Carbaugh did not locate the actual named lessee at the residence.

[FN 3] In his Omnibus [Pre-Trial Motion], [Truett] d[id] not identify what evidence was gathered by Det. Carbaugh from the residence. In addition, neither party presented evidence at the hearing regarding what, specifically, was found in the residence that the Commonwealth intend[ed] to use. …

Opinion and Order, 7/13/2018, at 1-3 (footnotes in original; one footnote omitted). Truett was ultimately located and taken into custody.

Several continuances and changes in counsel followed. On December 13, 2017, Truett, *pro se*, filed a Motion to Dismiss pursuant to Pa.R.Crim.P. 600. Counsel subsequently filed a Motion to Dismiss, as well as an Amended Motion to Dismiss, pursuant to Rule 600, on Truett's behalf. On January 2, 2018, after filing the Amended Motion to Dismiss, counsel filed a Motion to Withdraw as counsel, citing Truett's continued *pro se* filing of letters and documents with the clerk of courts, which disclosed potential trial strategy, witness names, and potential defense experts. By an Order entered on February 12, 2018,[2] the trial court permitted counsel to withdraw, and

---

[2] The Order is dated February 5, 2018.

- 3 -

appointed Truett new counsel. The trial court also continued the hearing on the Motion to Dismiss.

Following a hearing on February 22, 2018, the trial court granted defense counsel's oral Motion for leave to file a new Rule 600 motion. The trial court directed Truett to file such motion by March 9, 2018, and for the Commonwealth to file a response within the following week. Additionally, the trial court scheduled a hearing for March 19, 2018, and "caution[ed] both parties that we will not delay further in this matter…." Order, 2/23/18.

Truett, through counsel, filed a Motion to Dismiss pursuant to Rule 600. The Commonwealth filed an Answer. The trial court conducted a hearing on Truett's Motion to Dismiss and, on March 26, 2018, entered an Opinion and Order denying the Motion to Dismiss.

On April 20, 2018, Truett filed an Omnibus Pre-Trial Motion, including, *inter alia*, a Motion to suppress evidence found at the residence located at 147 W. North Street, and a Motion to suppress evidence obtained through the search of Rock's cell phone. The Commonwealth filed an Answer to Truett's Motions to suppress. The trial court conducted a hearing, and subsequently directed the parties to file post-hearing briefs in support of their respective positions. Both parties complied. On July 13, 2018, the trial court issued an Opinion and Order denying Truett's Omnibus Pre-Trial Motion.

Additional continuances and changes in defense counsel followed. A jury ultimately convicted Truett of the above-described offenses. The trial

court deferred sentencing and ordered the preparation of a pre-sentence investigation report. On January 17, 2020, the trial court sentenced Truett to a term of 120-480 months in prison, plus a fine and restitution for DDRID.[3] For the criminal use of a communication facility conviction, the trial court imposed a consecutive term of 18-84 months in prison, plus a fine.

Truett filed a timely Post-Sentence Motion on January 27, 2020. A hearing on the Motion was first scheduled for March 12, 2020, but then continued until March 30, 2020. Prior to the scheduled hearing, the Pennsylvania Supreme Court declared a statewide judicial emergency, which generally closed courts to the public "beginning at the close of business on March 19, 2020, and lasting through at least April 3, 2020…." **In re: General Statewide Judicial Emergency**, 228 A.3d 1283 (Pa. filed March 18, 2020) (*per curiam*); **see also In re: General Statewide Judicial Emergency**, 230 A.3d 1015 (Pa. filed April 28, 2020) (*per curiam*) (suspending most filing deadlines for the period between March 19, 2020, and May 8, 2020). Truett's counsel was subsequently granted permission to withdraw, and the trial court appointed new counsel. On May 11, 2020, the trial court entered an Order scheduling a hearing on Truett's Post-Sentence Motion for June 11, 2020. On June 12, 2020, Truett filed a Motion to extend the deadline in which to decide

---

[3] The convictions of delivery of heroin and DDRID merged for sentencing purposes.

his Post-Sentence Motion, citing the judicial emergency and the difficulty of scheduling video conferencing through the prison. The trial court granted the Motion and extended the deadline by 30 days. The trial court scheduled the hearing for July 31, 2020. The hearing was conducted as scheduled, and on August 12, 2020,[4] the trial court entered an Order denying Truett's Post-Sentence Motion. Truett filed a Notice of Appeal on September 9, 2020.[5]

_____

[4] The trial court attributed the delay between the filing of the Post-Sentence Motion and its ultimate ruling to the judicial emergency and "the significant difficulty in scheduling [Truett's] participation in the hearing via Advanced Communication Technology." Order, 8/12/20.

[5] Regarding the timeliness of Truett's appeal, we observe that when a defendant files a post-sentence motion, a notice of appeal must be filed "within 30 days of the entry of the order deciding the motion[, or] within 30 days of the entry of the order denying the motion by operation of law…." Pa.R.Crim.P. 720(A)(2)(a)-(b); **see also id.** 720(B)(3)(a) (providing that if a judge fails to decide a post-sentence motion within 120 days, it shall be deemed denied by operation of law). The 120-day period for deciding Truett's Post-Sentence Motion expired on May 26, 2020. Ultimately, for the reasons set forth above, the hearing did not occur until July 31, 2020, and the trial court did not issue its decision until August 12, 2020. In light of the unique circumstances surrounding the COVID-19 pandemic, and the scheduling difficulties arising therefrom, we will consider Truett's appeal as timely filed. Moreover, the docket lacks any indication that the Post-Sentence Motion was denied by operation of law at the end of the 120-day period. **See** Pa.R.Crim.P. 720(B)(3)(c) (providing that "[w]hen a post-sentence motion is denied by operation of law, the clerk of courts shall forthwith enter an order on behalf of the court"); **see also Commonwealth v. Perry**, 820 A.2d 734, 735 (Pa. Super. 2003) (declining to quash the appellant's appeal, which was filed beyond the 120-day period in which the court must decide on a post-sentence motion, because the failure by clerk of courts to enter an order deeming the appellant's post-sentence motion denied by operation of law constituted a breakdown in the court system).

Truett subsequently filed a court-ordered Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal.

Truett now raises the following issues for our review:

1. Whether the trial court erred in allowing the trial beyond the 365[-]day[ ]period prescribed by [Pa.R.Crim.P.] 600 by not sufficiently considering [Truett's] Rule 600 [M]otion to [D]ismiss and not sufficiently assessing whether there is excludable time and/or excusable delay in the 648 days [prior] to trial[?]

2. Whether the [t]rial [c]ourt erred by failing to instruct the jury relating to the [DDRID] charge[,] as the court's instructions did not sufficiently advise the jury of the requirement of "but-for causation[]"[?]

3. Whether the trial court abused its discretion in precluding testimony regarding the criminal history of a key prosecution witness[,] which hindered [Truett's] ability to mount a defense to include witness [Christopher] Hick[s's ("Hicks")[6] background as a drug dealer[?]

4. Whether the trial court erred in denying [Truett's M]otion to suppress evidence found at … 147 W. North St.[,] where property was searched after it was simply alleged by the property owner that [Truett] had abandoned the property[?]

5. Whether during [Truett's] trial, the prosecutor engaged in various forms of misconduct[,] including making a statement[,] "The Defendant's full-time job was peddling poison on the streets[]"[?]  At no time during the trial was the statement supported by evidence of the record and it created prejudice.

6. Whether the evidence presented was insufficient to establish that every element of [DDRID] was proven, that the delivery: (1) was committed by the accused; and[] (2) the drug delivered caused the victim's death—as it fails to sufficiently indicate an adequate level of causation for the result-of-conduct[?]

_____

[6] Hicks is Truett's alleged co-conspirator.

Brief for Appellant at 9 (issues renumbered).

In his first claim, Truett contends that the trial court erred by allowing his trial to begin beyond the 365-day period, and by failing to sufficiently consider his Rule 600 Motion. *Id.* at 20. Truett points out that charges were filed against him on two separate occasions: first, on July 25, 2014, he was charged with delivery of heroin, conspiracy, and criminal use of a communication facility; these charges were withdrawn, and on February 23, 2015, the charges were re-filed, as amended to include DDRID. *Id.* at 21-22. Truett argues that the mechanical run date for Rule 600 purposes is July 25, 2014, when the first Criminal Complaint was filed, because the re-filed charges were not based on new evidence. *Id.* at 23. Thus, Truett claims, the Commonwealth did not exercise due diligence in bringing him to trial. *Id.* at 27-28.

"With regard to claims brought under Rule 600, we must determine whether the trial court committed an abuse of discretion." *Commonwealth v. Murray*, 879 A.2d 309, 312 (Pa. Super. 2005).

> The proper scope of review is limited to the evidence on the record of the Rule 600 evidentiary hearing and the findings of the trial court. An appellate court must view the facts in the light most favorable to the prevailing party.
>
> When considering the trial court's ruling, an appellate court may not ignore the dual purpose behind Rule 600. The Rule serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society.
>
> > In determining whether an accused's right to a speedy trial has been violated, consideration must be given to

society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 600 must be construed in a manner consistent with society's right to punish and deter crime. In considering these matters, courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well. …

*Id.* at 312-13 (citations omitted).

Rule 600 provides, in pertinent part, as follows:

**(A) Commencement of Trial; Time for Trial**

* * *

(2) Trial shall commence within the following time periods.

(a) Trial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed.

* * *

**(C) Computation of Time**

(1) For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of time within which trial must commence. Any other periods of delay shall be excluded from the computation.

* * *

(3)(a) When a judge or issuing authority grants or denies a continuance:

* * *

(ii) the judge shall record the identity of the party requesting the continuance and the reasons for granting or denying the continuance. The judge also shall record to which party the period of delay caused by the continuance shall be attributed, and whether the time will be included in or excluded from the computation of the time within which trial must commence in accordance with this rule.

Pa.R.Crim.P. 600; *see also Commonwealth v. Barbour*, 189 A.3d 944, 947 (Pa. 2018) (stating that "[b]y the terms of Rule 600, the Commonwealth must bring a defendant to trial within 365 days from the date upon which a written criminal complaint is filed.").

"The first step in determining whether a technical violation of Rule 600 has occurred is to calculate the 'mechanical run date.'" *Murray*, 879 at 313. "The mechanical run date is calculated by adding 365 days to the date the criminal complaint is filed." *Commonwealth v. Peterson*, 19 A.3d 1131, 1137 n.6 (Pa. Super. 2011).

The mechanical run date can be modified or extended by adding any periods of time in which the defendant causes delay. Once the mechanical run date is modified accordingly, it then becomes an "adjusted run date."

Rule 600 takes into account both "excludable time" and "excusable delay." "Excludable time" is defined in Rule 600(C) as the period of time between the filing of the written complaint and the defendant's arrest, provided that the defendant could not be apprehended because his whereabouts was unknown and could not be determined by due diligence; any period of time for which the defendant expressly waives Rule 600; and/or such period of delay at any stage of the proceedings as results from: (a) the

unavailability of the defendant or the defendant's attorney; and/or (b) any continuance granted at the request of the defendant or the defendant's attorney. The "due diligence" required under Rule 600(C)(1) pertains to the Commonwealth's efforts to apprehend the defendant. The other aspects of Rule 600(C) defining "excludable time" do not require a showing of due diligence by the Commonwealth. "Excusable delay" is not expressly defined in Rule 600, but the legal construct takes into account delays which occur as a result of circumstances beyond the Commonwealth's control and despite its due diligence.

*Murray*, 879 at 313 (citations omitted); *see also Commonwealth v. Burno*, 154 A.3d 764, 793-94 (Pa. 2017) (explaining that excusable delay is not calculated against the Commonwealth in a Rule 600 analysis, as long as the Commonwealth acted with due diligence at all relevant times); *Commonwealth v. Morgan*, 239 A.3d 1132, 1137 (Pa. Super. 2020) (stating that, "in the most general terms, when the Commonwealth causes delay, the Rule 600 clock continues to tick; when the defendant causes the delay, the clock stops." (citation omitted)). Additionally, "[t]he Commonwealth bears the burden of proving due diligence by a preponderance of the evidence. Due diligence is fact-specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing that the Commonwealth has put forth a reasonable effort." *Burno*, 154 A.3d at 794 (citations and quotation marks omitted).

In cases where the Commonwealth files a complaint, the complaint is withdrawn or dismissed, and the Commonwealth then re-files the charges in a subsequent complaint, there are additional principles to keep in mind. If, for example, the Commonwealth withdraws the first complaint in an attempt to avoid an imminent Rule 600 violation and then re-files the charges in hopes of circumventing that rule, then the Rule 600 time for

- 11 -

the second complaint will be calculated from the filing of the first complaint.

However, if the Commonwealth is diligent in prosecuting a complaint, and if the complaint is withdrawn or dismissed because of factors beyond the Commonwealth's control, then the Commonwealth, upon re-filing the charges in a second complaint, is entitled to have the time under Rule 600 run from the date of that second filing. Accordingly, in cases of subsequent complaints, the law requires that Rule 600 courts evaluate whether the Commonwealth was diligent with respect to the initial complaint.

Additionally, if the Commonwealth was diligent in prosecuting the first complaint, the Commonwealth has no obligation under Rule 600 to re-file the charges within any particular time after the dismissal of the first complaint. This principle arises from the fact that, while no complaint is pending, the language of Rule 600 is simple inapplicable.

***Commonwealth v. Claffey***, 80 A.3d 780, 786-87 (Pa. Super. 2013)

(citations omitted).

Following the March 19, 2018, hearing on Truett's Motion to Dismiss, the trial court set forth the following findings of fact concerning the filing of charges against Truett:

On July 25, 2014, Det. Carbaugh filed charges of delivery of a controlled substance, criminal use of a communication facility, and conspiracy against [Truett]. …

When he filed the charges, Det. Carbaugh obtained a warrant for [Truett's] arrest. Det. Carbaugh then attempted to arrest [Truett] at [Truett's] last known residence, but was unsuccessful. Det. Carbaugh was then off-duty until the middle of August. Upon returning to work, Det. Carbaugh conducted surveillance on [Truett's] residence in an effort to apprehend him. Det. Carbaugh was again unsuccessful. Within a day or two of the incident, Det. Carbaugh interviewed the alleged co-conspirator …, [] Hicks. Hicks assisted Det. Carbaugh in trying to locate [Truett];

they even arranged a meet-up with [Truett] as a ruse to take [Truett] into custody. [Truett] did not show up.

In late August 2015, Det. Carbaugh received information on a possible second address for [Truett] in Roxbury; this information was provided from the FBI fugitive task force. Upon investigation with the United States Postal Service, Det. Carbaugh learned that the address in Roxbury was an old address for [Truett]. Det. Carbaugh also obtained a possible address for [Truett] through the county's [CYS]; that agency had an open case involving [Truett's] girlfriend. Det. Carbaugh was still unable to locate [Truett] with the CYS information. Additionally, Det. Carbaugh was aware that [Truett] was on active supervision with the Franklin County Adult Probation Office. Det. Carbaugh spoke with [Truett's] supervising officer; however, again, this did not result in Det. Carbaugh locating [Truett] to take him into custody.

In late September or early October 2014, Det. Carbaugh received the [C]oroner's report from the death of [] Rock. Det. Carbaugh spoke with Assistant District Attorney David Drumheller from the Franklin County District Attorney's Office [("ADA Drumheller")]. Based on his review of the [C]oroner's report, ADA Drumheller advised Det. Carbaugh that the Commonwealth would not be pursuing a charge of [DDRID] against [Truett].

In late January 2015, ADA Drumheller spoke again with Det. Carbaugh. ADA Drumheller advised Det. Carbaugh that he had spoken directly with the pathologist and reviewed the case with the District Attorney and Coroner. Based upon these additional discussions, the Commonwealth was now willing to proceed with charging [Truett] with DDRID. ADA Drumheller advised Det. Carbaugh to withdraw the charges he filed in July 2014, and refile them with an added count of DDRID. There was no discussion between ADA Drumheller and Det. Carbaugh regarding Pa.R.Crim.P. 600 (speedy trial). Det. Carbaugh then did as instructed, withdrawing and refiling the charges on February 23, 2015; the new [C]riminal [C]omplaint contained the added charge of DDRID.

Fifteen days after re-filing the charges, Det. Carbaugh received information on an address for [Truett] in the State of Maryland. Det. Carbaugh referred this information to the Pennsylvania State Police (PSP) Fugitive Task Force. PSP communicated with law enforcement authorities in Maryland and

learned that [Truett] was a suspect in an arson case there. Shortly thereafter, [Truett] was taken into custody.

Trial Court Opinion (Motion to Dismiss), 3/26/18, at 1-3.

Regarding the time between the filing of the first and second Criminal Complaints, the trial court concluded that the record "is devoid of any evidence of intent on the part of the Commonwealth to evade or thwart [Truett's] speedy trial right when it withdrew the charges and refiled them in February 2015." *Id.* at 12. Additionally, the trial court concluded that the Commonwealth demonstrated due diligence in prosecuting the first Criminal Complaint, and therefore, the mechanical run date for Rule 600 purposes is February 23, 2015. *Id.* at 12-14. Specifically, the trial court noted Det. Carbaugh's ongoing efforts to locate Truett during the time period between the first and second Criminal Complaints. *Id.* at 12-13.

Although the second Criminal Complaint was amended to include a DDRID charge after the initial review by the Coroner, Det. Carbaugh testified that he had been informed that the District Attorney's Office had followed up directly with the pathologist and the Coroner before deciding to include the DDRID charge. N.T., 3/19/18, at 8, 15; Trial Court Opinion (Motion to Dismiss), 3/26/18, at 13. We therefore agree with the trial court's conclusion that there is no evidence in the record to support an assertion that the Commonwealth filed the second Criminal Complaint merely in an attempt to circumvent Rule 600. *See Claffey*, *supra*. Further, the record confirms the trial court's determination that the Commonwealth exercised due diligence in

prosecuting the first Criminal Complaint. Truett remained a fugitive and was not located until approximately two weeks *after* the second Criminal Complaint was filed. During that time, Det. Carbaugh made several attempts to locate Truett at several addresses, surveilled Truett's last known address, attempted to contact Truett through Hick, contacted government agencies, and received a possible address from the FBI. *See id.* at 13-14; *see also id.* at 13 n.31 (stating that "Det. Carbaugh did far more than sit on his hands and wait for [Truett's] serendipitous apprehension[.]"); Pa.R.Crim.P. 600, cmt. (providing that "the period of time between the filing of the written complaint and the defendant's arrest [must be excluded from computations], provided that the defendant could not be apprehended because his or her whereabouts were unknown and could not be determined by due diligence[.]"). Based upon the foregoing, we discern no abuse of the trial court's discretion in applying a mechanical run date of February 23, 2015, 365 days after the second Criminal Complaint was filed.[7] Accordingly, we cannot grant Truett relief on this claim.

In his second claim, Truett contends that the trial court did not sufficiently advise the jury regarding "but-for" causation in its DDRID instruction. Brief for Appellant at 15. Truett cites **Burrage v. United States**,

---

[7] Truett does not allege that his speedy trial rights were violated assuming a mechanical run date of February 23, 2015, nor does he challenge the trial court's determinations regarding any other delays. For a full analysis of excludable time under Rule 600, **see** Trial Court Opinion (Motion to Dismiss), 3/26/18, at 14-15.

571 U.S. 204 (2014),[8] and argues that a "but-for" finding to prove actual cause. Brief for Appellant at 15.[9]

> We review a challenge to a jury instruction for an abuse of discretion or an error of law. We must consider the charge as a whole, rather than isolated fragments. We examine the entire instruction against the background of all evidence presented, to determine whether error was committed. A jury charge is erroneous if the charge as a whole is inadequate, unclear, or has a tendency to mislead or confuse the jury rather than clarify a material issue. Therefore, a charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said. Furthermore, our trial courts are invested with broad discretion in crafting jury instructions, and such instructions will be upheld so long as they clearly and accurately present the law to the jury for its consideration. …

*Commonwealth v. Rush*, 162 A.3d 530, 540 (Pa. Super. 2017) (citations, quotation marks and brackets omitted).

Regarding DDRID, the trial court charged the jury as follows:

> Count [O]ne in this case is drug delivery resulting in death. To find the defendant guilty of this offense you must find that the following elements have been proven beyond a reasonable doubt.

---

[8] In *Burrage*, the United States Supreme Court analyzed 21 U.S.C.A. § 841(b)(1)(C), a federal statute providing for an enhanced sentence when death or serious bodily injury "results from," *inter alia*, the delivery of a schedule I or II controlled substance. The Supreme Court held that a defendant cannot be liable under the penalty enhancement provision unless the use of the drug distributed by the defendant is a but-for cause of the death. *Burrage*, 571 U.S. at 218-19.

[9] Truett's one-page argument concerning this claim is largely undeveloped, and significantly, does not identify the jury instruction given by the trial court. *See* Pa.R.A.P. 2119(a) (providing that an appellant's argument shall contain "such discussion and citation of authorities as are deemed pertinent.").

First, that the defendant administered, dispensed, delivered, gave, prescribed, sold or distributed a controlled substance or a counterfeit controlled substance to a person.

Second, that the defendant did so intentionally, that is, it was his conscious object to administer, dispense, deliver, give, prescribe, sell or distribute a controlled substance or a counterfeit controlled substance to a person.

Third, that the administration, dispensation, prescription, sale or distribution was in violation of the Controlled Substance Drug Device and Cosmetic Act.

Fourth, that the person has died as a result of using the substance.

[Truett] has been charged with causing the death of [] Rock. To find [Truett] guilty of [DDRID,] you must find beyond a reasonable doubt that [Truett's] conduct was a direct cause of his death. In order to be a direct cause of a death[,] a person's conduct must be a direct and substantial factor in bringing about the death. There can be more than one direct cause of a death. A defendant who is a direct cause of a death may be criminally liable even though there are other direct causes.

N.T., 12/13/19, at 71-72.[10]

The Crimes Code defines the offense of DDRID as follows:

### § 2506. Drug delivery resulting in death

_____

[10] The trial court used the Commonwealth's requested points for charge for the offense of DDRID. In its Requested Points for Charge, the Commonwealth identified the Pennsylvania Suggested Standard Jury Instruction 15.2506 – Drug Delivery Resulting in Death, for offenses committed on or after September 7, 2011; the language concerning direct cause was taken from Pennsylvania Suggested Standard Jury Instruction 15.2501C – Criminal Homicide – Causation. **See** Commonwealth's Requested Points for Charge, 11/22/19, at 3-4. Truett filed an Objection concerning this language. **See** Defendant's Objection to Commonwealth's Proposed Jury Instruction, 12/09/19, at 1 (unnumbered).

**(a) Offense defined.--**A person commits a felony of the first degree if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of ... The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S.A. § 2506(a). DDRID therefore "consists of two principal elements: (i) intentionally administering, dispensing, delivery, giving, prescribing, selling or distributing any controlled substance or counterfeit controlled substance and (ii) death caused by ("resulting from") the use of that drug." *Commonwealth v. Kakhankham*, 132 A.3d 986, 991-92 (Pa. Super. 2015) (footnote omitted).

Prior to the start of trial, the trial court addressed Truett's Objection to the Commonwealth's requested points for charge concerning DDRID. The trial court noted Truett's citation to *Burrage*, but concluded that it was not bound by the Supreme Court's decision because it was based on an interpretation of federal statutory law. N.T., 12/10/19, at 4-5. The trial court also concluded that the Commonwealth's proposed jury instruction was proper under Pennsylvania law. *Id.* at 6-7. Truett did not otherwise raise an objection at the time the jury instruction was read to the jury.

Our review of the jury instruction and the relevant law defining DDRID confirms that the instruction provided by the trial court adequately and clearly reflected the law, and had no tendency to mislead or confuse the jury. *See Rush*, *supra*. Because we discern no abuse of discretion or error by the trial court, Truett is not entitled to relief on this claim.

- 18 -

In his third claim, Truett argues that the trial court abused its discretion by precluding testimony concerning Hicks's criminal history. Brief for Appellant at 32. Truett claims that he should have been permitted to introduce evidence that Hicks had a prior conviction of drug delivery, which he could have used to impeach Hicks's testimony. *Id.* at 32-33. According to Truett, the Commonwealth failed to disclose to him Hicks's prior involvement as a confidential informant. *Id.* at 33.

Initially, we observe that Truett fails to cite to the Pennsylvania Rules of Evidence in support of his claim. Additionally, Truett's argument conflates the issues of relevance and impeachment. Because Truett cites only to case law defining the evidentiary definition of relevance, we limit our discussion to relevance.[11]

> The determination of the scope and limits of cross-examination are within the discretion of the trial court, and we cannot reverse those findings absent a clear abuse of discretion or an error of law. An abuse of discretion is not a mere error in judgment, but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law. Furthermore, when a trial court indicates the reason for its decision our scope of review is limited to an examination of the stated reason.

---

[11] Truett does not argue that Hicks's prior conviction is admissible as a *crimen falsi* conviction. *See* Pa.R.E. 609(a) (providing that, "[f]or the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere*, must be admitted if it involved dishonesty or false statement.").

*Commonwealth v. Davis*, 17 A.3d 390, 395 (Pa. Super. 2011) (citations, quotation marks, and brackets omitted).

"Relevance is the threshold for admissibility of evidence." *Commonwealth v. LeClair*, 236 A.3d 71, 78 (Pa. Super. 2020) (citation omitted); *see also* Pa.R.E. 402. "Evidence is relevant if … it has any tendency to make a fact more or less probable than it would be without the evidence[,] and the fact is of consequence in determining the action." Pa.R.E. 401.

In its Opinion, the trial court stated that "evidence of the prior delivery conviction is not motive of cooperating with the police in a later, <u>unrelated</u>, investigation into this DDRID." Trial Court Opinion, 10/28/20, at 7 (emphasis in original). Additionally, during a sidebar discussion at trial, the trial court indicated that it would not be "improper for [defense counsel] to establish the reason [Hicks] has begun cooperating," but that defense counsel could not elicit testimony about the prior conviction. N.T., 12/11/19, at 60; *see also id.* (stating, "We need that clarified. I don't want the jury confusing the fact that he cooperated because he got in trouble for [] delivering being confused with this delivery in this case.").

Our review confirms that the trial court permitted Truett to examine Hicks's criminal history, including prior involvement in drug activity, and his relationship with law enforcement as a confidential informant. *See* Trial Court Opinion, 10/28/20, at 7-9; N.T., 12/11/19, at 51-56, 58-59, 61. Accordingly, we agree with the trial court's determination that additional evidence of

Hicks's prior *conviction* of delivery of a controlled substance was not relevant to the instant matter, and we can afford Truett no relief on this claim.

In his fourth claim, Truett challenges the suppression court's denial of his Motion to suppress evidence found in the residence at 147 W. North Street.[12] Brief for Appellant at 35. Truett argues that, according to the lease, the lessor of the premises was Kenneth L. Miller, rather than the landlord. *Id.* According to Truett, the landlord lacked authority to enter the residence or to grant Det. Carbaugh permission to enter the residence. *Id.* at 37. Additionally, Truett contends that Det. Carbaugh had no evidence that the residence had been abandoned. *Id.* at 38; *see also id.* at 37 (acknowledging that Judgment of possession had been entered in favor of the landlord regarding the residence on August 28, 2014, but arguing that the landlord was not permitted to enter the premises, or grant Det. Carbaugh to do so, until 10 days later).

> In reviewing the denial of a motion to suppress, our responsibility is to determine whether the record supports the suppression court's factual findings and legitimacy of the inferences and legal conclusions drawn from those findings. If the suppression court held for the prosecution, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the factual findings of the suppression court are supported by the evidence, the appellate court may reverse if there is an error in the legal conclusions drawn from those factual findings.

---

[12] Truett's argument, as in his Motion to suppress, fails to identify any evidence recovered from the residence that the Commonwealth used against him at trial.

- 21 -

*Commonwealth v. Arnold*, 932 A.2d 143, 145 (Pa. Super. 2007) (citation

omitted).

> Warrantless searches and seizures are considered to be unreasonable and therefore, prohibited, except for a few established exceptions pursuant to both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.
>
> Both the federal and Pennsylvania constitutions permit third party consent to a search. When police officers obtain the voluntary consent of a third party who has the authority to give consent, they are not required to obtain a search warrant based upon probable cause. …

*Commonwealth v. Hughes*, 836 A.2d 893, 900 (Pa. 2003) (internal citations

and quotation marks omitted). "The third-party consent to search is an

exception to the exclusionary rule. To evaluate the voluntariness of the

consent to a warrantless search, the court must examine the totality of the

circumstances." *Commonwealth v. Reese*, 31 A.3d 708, 722 (Pa. Super.

2011).

Third-party consent may be derived from common or apparent

authority. *See generally Commonwealth v. Basking*, 970 A.2d 1181,

1184 (Pa. Super. 2009) (describing the doctrines of common authority and

apparent authorities as "corollaries to the consent exception to the warrant

requirement[]").

> The United States Supreme Court has held that a third party has actual authority to consent to a search if he/she "possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected." [*United States v.*] *Matlock*, 415 U.S. 164[, ] 171 [(1974)]…. The *Matlock* Court described "common authority" as follows:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at n.7 (citations omitted).

*Basking*, 970 A.2d at 1188.

Further, regarding third-party consent by landlords, "common authority is not implied by a mere property interest such as that of a landlord. To that end, a landlord or lessor cannot consent to a search of a tenant's premises, regardless of the lessor's right to enter and inspect." *Commonwealth v. Davis*, 743 A.2d 946, 951 (Pa. Super. 1999) (citations and quotation marks omitted). However, a lessee's abandonment of a residence may alter this analysis. *See generally Commonwealth v. Dean*, 940 A.2d 514, 519 n.2 (Pa. Super. 2008) (stating that "**in the absence of abandonment**, a landlord's … consent to search leased premises is not effective as against the tenant…." (emphasis added; citation and quotation marks omitted)).

> To prevail on a suppression motion, a defendant must demonstrate a legitimate expectation of privacy in the area searched or effects seized, and such expectation cannot be established where a defendant has meaningfully abdicated his control, ownership or possessory interest. Simply put, no one has standing to complain of a search or seizure of property that he has

voluntarily abandoned. … [A]bandonment of a privacy interest is primarily a question of intent and may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered. The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could not longer retain a reasonable expectation of privacy with regard to it at the time of the search.

**Commonwealth v. Kane**, 210 A.3d 324, 330-31 (Pa. Super. 2019)

(citations, quotation marks, brackets and paragraph break omitted).

A third party's apparent authority to provide consent to search may also

give rise to an exception to the exclusionary rule. **See Commonwealth v.**

**Perel**, 107 A.3d 185, 192 (Pa. Super. 2014).

Third[-]party consent is valid when police reasonably believe a third party has authority to consent. Specifically, the apparent authority exception turns on whether the facts available to police at the moment would lead a person of reasonable caution to believe the consenting third party had authority over the premises. If the person asserting authority to consent did not have such authority, that mistake is constitutionally excusable if police reasonably believed the consenter had such authority and police acted on facts leading sensibly to their conclusions of probability.

**Id.** (citation omitted).

Here, the trial court concluded that the landlord had both actual and

apparent authority to provide consent to search the residence at 147 W. North

Street. **See** Trial Court Opinion, 10/28/20, at 6-10. Regarding actual

authority, the trial court stated that

[t]he uncontroverted testimony established that the landlord was contacted by [CYS] because that agency did not know where the

- 24 -

children of [] Jewel (the leaseholder) were. This is consistent with abandoning the residence. The evidence is uncontroverted that the landlord went to the residence and observed through the windows that "everything was gone" inside. Further, Det. Carbaugh had been watching the property over the course of a week or so in an effort to locate [Truett]. During his observations, there was no activity at the residence which would indicate anyone was living there.

*Id.* at 8.

Further, regarding apparent authority, the trial court again pointed to Det. Carbaugh's repeated attempts to locate Truett, including staking out the residence. *Id.* at 9. The trial court also stated that

[w]hen Det. Carbaugh arrived at the residence, the landlord was already inside the residence; this fact is a potent indicator to an objective viewer that the landlord had physical possession of the residence and could consent. The landlord advised Det. Carbaugh that the property had been abandoned and that she had been granted possession by the Magisterial District Judge.

*Id.* The trial court concluded that, based on the circumstances, Det. Carbaugh could reasonably have concluded that the landlord had authority to provide consent. *Id.*

The trial court's factual findings are supported by the record, and its legal conclusions are sound. *See Arnold*, *supra*. Accordingly, Truett is not entitled to relief on this claim.

In his fifth claim, Truett argues that the prosecutor engaged in misconduct during opening statements. Brief for Appellant at 39. Truett specifically refers to the following portion of the prosecutor's opening statement:

- 25 -

> This case and what we're all here for today, this case is about a guy who pedaled [*sic*] poison on to our streets here in Franklin County. It's about a guy whose full-time job was to deal heroin in our community.
>
> Ladies and gentlemen, because of his own actions[,] a man is dead. A father lost his golfing buddy. A mother lost her son because of his decision to pump poison into our streets.

*Id.* (citing N.T., 12/10/19, at 24-25). Truett claims that the statement was unsupported by evidence and created prejudice. *Id.* at 40. According to Truett, the prosecutor "injected his highly prejudicial personal opinion" of Truett. *Id.*

Our review of the trial transcript confirms that Truett did not raise an objection to the prosecutor's opening statement. Thus, this claim is waived. *Commonwealth v. Duffy*, 832 A.2d 1132, 1136 (Pa. Super. 2003) (stating that "[i]n order to preserve an issue for review, a party must make a timely and specific objection." (citation omitted)); *see also* Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal.").[13]

In his sixth and final claim, Truett challenges the sufficiency of the evidence supporting his conviction. Brief for Appellant at 42. Truett argues

---

[13] Moreover, as the trial court noted in its Opinion, Truett's attorney agreed to the characterization of heroin as poison. Trial Court Opinion, 10/28/20, at 11; N.T., 12/10/19, at 30 (wherein, during the defense's opening statement, defense counsel stated, "[The prosecutor] in his opening statement said that this case was about someone who's dumping poison in the streets of Franklin County. I agree with that.").

that there was no direct evidence of the transaction between Truett and Rock; there was no DNA or fingerprint evidence connecting Truett to the heroin found in Rock's room; and there was nothing distinguishable about the heroin found at the scene. *Id.* Additionally, Truett challenges the credibility of Hicks's trial testimony. *Id.* Truett also renews his challenge to the jury instruction regarding DDRID. *Id.* at 43. According to Truett, he "should be granted a new trial, or alternatively, a modification of sentence to the lower end of the standard range…." *Id.* at 45.[14, 15]

> The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak

---

[14] Truett's argument is largely underdeveloped, and includes citations only to our standard of review, the Pennsylvania Suggested Standard Jury Instruction, and **Burrage**, which is not binding on this Court. **See** Pa.R.A.P. 2119(a).

[15] To the extent that Truett attempts to challenge the discretionary aspects of his sentence, such claim is waived, as he failed to provide argument on the issue, include a separate Rule 2119(f) statement in his brief, or raise the issue in his Statement of Questions Involved. **See** Pa.R.A.P. 2119(a) (providing that an appellant's argument shall include "such discussion and citation of authorities as are deemed pertinent."), (f) (stating that "[a]n appellant who challenges the discretionary aspects of a sentence in a criminal matter shall set forth in a separate section of he brief a concise statement of the reasons relied upon for allowance of appeal…."); Pa.R.A.P. 2116(a) (providing that "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.").

and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence.

*Commonwealth v. Talbert*, 129 A.3d 536, 542-43 (Pa. Super. 2015) (citation omitted). "Both direct and circumstantial evidence must be considered equally when assessing the sufficiency of the evidence …, and the Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by relying wholly on circumstantial evidence." *Commonwealth v. Davalos*, 779 A.2d 1190, 1193 (Pa. Super. 2001).

In its Opinion, the trial court summarized the relevant testimony, and concluded that Truett's claim lacks merit. *See* Trial Court Opinion, 10/28/20, at 12-36. Significantly, the trial court pointed to the testimony of Detective Jason Taylor ("Det. Taylor"), a member of the Franklin County Drug Task Force. *See id.* at 19-21. Det. Taylor indicated that the heroin at the scene of Rock's death was found in unique packaging, which he previously had not seen in Franklin County. *See id.* at 20; N.T., 12/10/19, at 168-69 (wherein Det. Taylor explained that the heroin found at the scene was "placed in to [*sic*] a straw and then the straw was closed on each end by being burned and pressed or, you know, had some heat source and then being pressed together…."). "Similar items were recovered from [Truett's] apartment." Trial

- 28 -

Court Opinion, 10/28/20, at 21; N.T., 12/10/19, at 176-77 (wherein Det. Taylor reviewed Commonwealth's Exhibit 56 (items recovered from Truett's apartment), and stated that there was a "clear straw. There's some smaller pieces cut. There's also one package in here—let me make sure. There's one package in here that appears to have burnt or heated ends to it that was similar to what we found in the room where [] Rock was found."). Upon review, we agree with the trial court's determination that the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to sustain Truett's DDRID conviction. We affirm on the basis of the trial court's Opinion as to this claim. *See* Trial Court Opinion, 10/28/20, at 12-36.[16]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/2/2021

---

[16] Additionally, to the extent that Truett asks us to reassess Hicks's credibility, we note that such task rests solely with the fact-finder. *See Talbert*, *supra*.

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA – FRANKLIN COUNTY

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | CRIMINAL ACTION |
| | : | |
| | : | CP-28-CR-000865-2015 |
| V. | : | |
| | : | **JUDGE JEREMIAH D. ZOOK** |
| | : | |
| **BRADLEY JAY TRUETT,** | : | |
| | : | |
| DEFENDANT | : | |

## OPINION – Pa.R.A.P. 1925(a)

### I.  PROCEDURAL HISTORY

On December 13, 2019, a jury convicted the Defendant of, *inter alia*, Drug Delivery Resulting in Death (DDRID).[1]  *See Verdict Slip*, December 13, 2019.  The court imposed sentence on January 17, 2020.  *See Order of Court*, January 17, 2020.

The Defendant filed a timely *Post-Sentence Motion* on January 27, 2020.  The court directed the Commonwealth to respond and scheduled hearing for March 12, 2020.  *See Order*, January 28, 2020.   On February 27, 2020, the Defendant requested a continuance of the hearing.  *See Motion for Continuance*, February

Filed **OCT 2 8 2020**

*Barbara E. Black*

Clerk

---

[1] *See* 18 Pa.C.S. § 2506(a).

27, 2020. The court granted the continuance until March 30, 2020. *See Order of Court,* February 27, 2020.

On March 18, 2020, the Supreme Court of Pennsylvania ordered all courts generally closed and continued non-essential proceedings pending further order of the individual President Judges. *See In re: General Statewide Judicial Emergency,* Nos. 531 and 532 Judicial Administration Docket (March 18, 2020). These restrictions remained generally in place through June 1, 2020. *See In re: General Statewide Judicial Emergency,* Nos. 531 and 531 Judicial Administration Docket, *Second Supplemental Order* (April 1, 2020); *see also In re: General Statewide Judicial Emergency,* Nos. 531 and 532 Judicial Administration Docket, *Emergency Order of Statewide Judicial Administration Applicable From May 1, 2020, through June 1, 2020* (April 28, 2020). These directives resulted in the automatic cancelation of the March 30, 2020, hearing in this matter.

On April 3, 2020, counsel for the Defendant sought leave to withdraw due to new employment. *See Petition to Withdraw,* April 3, 2020. The court granted the request and appointed present counsel to represent the Defendant; the court further directed that

2

hearing on the *Post-Sentence Motion* would be scheduled upon the expiration of the judicial emergency then in effect. *See Order of Court*, April 8, 2020.

Upon this court determining the state-wide judicial emergency would not extend beyond June 1, 2020, and with the permission of the President Judge of the 39th Judicial District, hearing on the Defendant's *Post-Sentence Motion* was scheduled for June 11, 2020. *See Order*, May 11, 2020. The Defendant was directed to appear via advanced communication technology (ACT). *Id.*

Although the record is silent as what occurred on June 11, 2020, the court recalls from memory that the Defendant was unable to appear via ACT from the state correctional institute.[2] The Defendant requested the court extend the deadline for decision on the pending *Post-Sentence Motion*. *See Motion to Extend Deadline to Decide Post-Sentence Motion*, June 12, 2020. The court granted the request. *See Order of Court*, June 12, 2020.

Hearing was ultimately scheduled for and held on July 31, 2020. *See Order*, June 16, 2020. This court denied the

---

[2] We are generally aware of the great difficulty in scheduling ACT appearances from the SCI due to the dramatic increase in ACT use resulting from the COVID-19 pandemic. If memory serves, the SCI advised court administration that the previously scheduled hearing could no longer be accommodated.

3

Defendant's *Post-Sentence Motion* on August 12, 2020. *See Order,*
August 12, 2020.

The Defendant filed the instant timely *Notice of Appeal* on
September 9, 2020. On September 10, 2020, the court directed the
Defendant to file and serve a concise statement of errors. *See
Order,* September 10, 2020. The Defendant timely complied on
October 1, 2020. *See Concise Statement of Errors Complained of on
Appeal (Concise Statement),* October 1, 2020.

## II. OPINION ON CLAIMS OF ERROR

### A. The Trial Court erred by failing to instruct the jury relating to the drug delivery resulting in death charges as the court's instructions did not sufficiently advise the jury of the requirement of "but-for causation."[3]

We believe this claim of error relates to this court's ruling on
the Defendant's *Objection to Commonwealth's Proposed Jury
Instruction (Objection),* filed December 9, 2020. The Defendant's
*Objection* was filed in response to the Commonwealth's *Requested
Points for Charge,* filed November 22, 2019, at pp. 3 – 4 (relating to
DDRID). We are unaware of any other objection lodged by the
Defendant to the jury instruction for the DDRID charge.

---

[3] *Concise Statement,* ¶ 1.

4

On the first day of trial, and prior to the jury entering the courtroom, this court issued an order overruling the Defendant's *Objection* to the Commonwealth's proposed jury instruction. *See Order of Court*, December 10, 2019. Prior to issuing the order, we set forth on the record our conclusions of law. *See Transcript of Proceedings of Jury Trial (Tr.1)*, December 10, 2019, pp. 3 – 7. We rely on our reasoning therein, and the appellate decisions noted in support.

**B. The trial court erred in allowing the trial beyond the 365 day-period prescribed by Rule 600 by not sufficiently considering defendant's Rule 600 motion to dismiss and not sufficiently assessing whether there is excludable time and/or excusable delay in the 648 days to trial.[4]**

As the Superior Court may likely find, the record of these proceedings is a convoluted bag of counseled pleadings and numerous *pro se* filings/correspondence. Complicating things further is the fact that the Defendant has been represented by numerous attorneys over the tortured history of this case. It may be no easy feat to identify where in the record the asserted error lies.

---

[4] *Concise Statement*, ¶ 2.

5

The record reveals no less than four (4) motions[5] seeking dismissal of the charges under Pa.R.Crim.P. 600. To this court's knowledge, the first three motions were deemed withdrawn/dismissed without prejudice to the filing of a new motion to dismiss. *See Order of Court*, February 22, 2018, ¶ 1. We presume, therefore, the Defendant claims error related only to the court's ruling on the March 9, 2018, *Motion to Dismiss*. This court authored a comprehensive *Opinion* setting forth our reasons for denying the *Motion to Dismiss*. *See Opinion and Order*, March 26, 2018. We refer the Honorable Superior Court to that *Opinion* as it adequately explains our reasoning.

**C. The trial court abused its discretion in precluding testimony regarding the criminal history of a key prosecution witness which hindered Defendant's ability to mount a defense to include witness Hick's background as a drug dealer.[6]**

Although not specifically cited to in the record by the Defendant, we believe the asserted erroneous ruling occurred on the second day of the jury trial. *See Transcript of Proceedings of Jury*

---

[5] 1) *Motion to Dismiss Pursuant to Pa.R.Crim.P. 600(2)(a)*, filed *pro se* on December 17, 2017; 2) *Motion for Request to Dismiss Pursuant to Pa.R.Crim.P. 600(G)*, filed by Attorney Weisbrod on December 18, 2017; 3) *Amended Motion to Dismiss Pursuant to Pa.R.Cim.P. 600*, filed by Attorney Weisbrod on December 22, 2017; and 4) *Motion to Dismiss*, filed by Attorney Kulla on March 9, 2018.

[6] *Concise Statement*, ¶ 3.

6

*Trial* (*Tr.*2), December 11, 2019, pp. 56 – 60.[7] Contrary to the Defendant's assertion, this court permitted the Defendant to explore with Mr. Hick's his prior involvement with the police as a confidential informant, including the reason he cooperated with the police before this incident, *i.e.*, evidence of being implicated in an unrelated drug delivery. *See Tr.2*, p. 60. However, the court did not permit the Defendant to admit evidence that Mr. Hick's was previously <u>convicted</u> of that drug delivery. *Id.* As we explained to the attorneys at the time, evidence of the prior delivery conviction is not motive for cooperating with the police in a later, <u>unrelated</u>, investigation into this DDRID.

The Defendant sought leave of the court to ask Mr. Hicks about his prior drug delivery conviction. *See Tr.2*, p. 56. The Commonwealth objected citing the fact that Mr. Hicks testified he cooperated with the Commonwealth in the DDRID without expectation of consideration. *Id.* We noted that the Defendant had not tied Mr. Hick's prior drug <u>conviction</u> with the charges against the Defendant. *Id.* However, we permitted the Defendant to explore

---

[7] The day prior, the Court heard argument from the parties on this question as well; there was significant discussion between the Court and counsel on this issue. *See Tr.1*, pp. 198 – 230.

his relationship with law enforcement as a confidential informant/cooperating witness. *See Tr.2*, p. 57.

During the Defendant's subsequent cross-examination of Mr. Hicks, the Commonwealth lodged a second objection. *See Tr.2*, p. 60. At that time, the court clarified that the Defendant was entitled to question Mr. Hicks regarding his cooperation with law enforcement, including questioning about prior drug activity that initially brought him to attention of the police. *Id.* However, we maintained our ruling that evidence of Mr. Hick's prior conviction for drug delivery, unrelated to the instant case, was not admissible. *Id.*

To the extent the Defendant complains that the court prohibited him from probing Mr. Hick's "criminal history," the record belies that assertion. As we indicated above, the Defendant was permitted to question Mr. Hicks regarding his prior cooperation with law enforcement, including the reason he came to the attention of the police in the first place. What was prohibited was evidence of the Mr. Hick's <u>conviction</u> for drug delivery, which there is no dispute was unrelated to, *i.e.*, had nothing to do with, the charges against the Defendant. The Defendant probed Mr. Hicks for bias in

8

favor of law enforcement, including whether he had been promised anything in exchange for his cooperation. *See Tr.2*, pp. 55, 58 – 61. We fail to see how Mr. Hicks prior conviction[8] was relevant to motive to cooperate <u>subsequently</u> with law enforcement in this matter.

**D. The trial court erred in denying Defendant's motion to suppress evidence found at the residence of 147 W. North St. where property was searched after it was simply alleged by the property owner that the Defendant had abandoned the property.**[9]

We authored findings of fact and conclusions of law in support of our order denying the Defendant's suppression motion. *See Opinion* and *Order*, July 13, 2018. We refer the Honorable Superior Court to that *Opinion*, as it adequately explains our reasoning.

**E. During Defendant's trial, the prosecutor engaged in various forms of misconduct including making a statement "The defendant's full-time job was peddling poison on the streets." At no time during the trial was the statement supported by evidence of record and it created prejudice.**[10]

Trial in this matter occurred over the course of four days. Although the transcripts from the trial have been in the record since April 16, 2020, the Defendant does not bother to cite

---

[8] There is no dispute the crime of delivery of a controlled substance is not a crime of dishonesty, which would otherwise be admissible under Pa.R.E. 404(a)(3) and 609(a).

[9] *Concise Statement*, ¶ 4.

[10] *Concise Statement*, ¶ 5.

specifically where/when these statements were alleged to have been made. However, with the assistance of computer technology,[11] this court identified two places in the trial transcripts where peddling "poison" was put to the jury.

At the beginning of Commonwealth's opening statement to the jury, the prosecutor stated:

> This case and what we're all here for today, this case is about a guy who pedaled poison on to our streets here in Franklin County. It's about a guy whose full-time job was to deal heroin in our community.
>
> Ladies and gentlemen, because of his own actions a man is dead. A father lost his golfing buddy. A mother lost her son because of his decision to pump poison into our streets.

*Tr.1*, pp. 24 – 25. The Defendant did not lodge an objection at the time the Commonwealth made these statements; the Defendant did not lodge an objection to these statements at the end of the Commonwealth's opening statement. *See Tr.1*, p. 29.

---

[11] In addition to the original transcripts in the record, this court has the benefit of electronic versions in .pdf format. These electronic versions allow a search of the documents for specific words or phrases. We utilized this function for purposes of this opinion; we certainly did not read the entire transcript in a search for these words. We believe it is incumbent on the Defendant to appropriately identify the portion of the record where the asserted error lies. Had the Defendant done so, both this court and the Honorable Superior Court would know precisely the claim at hand; rather, we are left to speculate based on our own search.

In fact, the Defendant agreed that heroin is poison and someone was pumping into the streets of Franklin County. During his opening statement to the jury, counsel for the Defendant stated:

> Attorney Faust in his opening statement said that this case was about someone who's dumping poison in to the streets of Franklin County. I agree with that. I totally 100 percent agree, but that person was not [the Defendant]. That person was who the Commonwealth is asking you to believe in this case. That person was Christopher Hicks.

*Tr.1*, p. 30. In light of the Defendant's failure to object to the Commonwealth's statement to the jury and his own agreement with the same (other than who was responsible), the issue he now seeks reviewed is waived. As our Supreme Court has noted:

> Issue preservation is foundational to proper appellate review. Our rules of appellate procedure mandate that 'issues not raised in the lower court are waived and cannot be raised for the first time on appeal.' Pa.R.A.P. 302(a). By requiring an issue be considered waived if raised for the first time on appeal, our courts ensure that the trial court that initially hears a dispute has had an opportunity to consider the issue. This jurisprudential mandate is also grounded upon the principle that a trial court, like an administrative agency, must be given the opportunity to correct its errors as early as possible. Related thereto, we have explained in detail the importance of this preservation

11

requirement as it advances the orderly and efficient use of our judicial resources. Finally, concepts of fairness and expense to the parties are implicated as well.

*In re F.C. III,* 2 A.3d 1201, 1211 – 12 (Pa. 2010) (internal citations omitted).

**F.    The evidence presented was insufficient to establish that every element of the Drug Delivery Resulting in Death charge was proven, that the delivery: (1) was committed by the accused; and, (2) the drug delivered caused the victim's death – as it fails to sufficiently indicate an adequate level of causation for the result-of-conduct.**[12]

A challenge to the sufficiency of the evidence presented to sustain a conviction is subject to well-settled principles:

> In reviewing a sufficiency of evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence and substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Koch,* 39 A.3d 996, 1001 (Pa.Super. 2011) (internal citations omitted). The following evidence was presented at trial:

---

[12] *Concise Statement,* ¶ 6.

## Testimony of Scott Rock

In July 2014, Mr. Rock was living in an apartment in the Borough of Waynesboro, Franklin County, with his wife, two sons, and his grandson. *Tr.1*, pp. 34 – 36. The victim, Bryon Rock,[13] was one of Mr. Rock's sons residing with him. Mr. Rock testified that the victim suffered an injury to his finger in the past; the victim subsequently became addicted "pills" as a result. *Tr.1*, p. 39.

In July 2014, the victim admitted to Mr. Rock that he had begun using heroin. *Tr.1*, p. 39. On the evening of July 21, 2014, the victim told his father he was tired and was heading to bed; he asked his father to wake him up in the morning because he had to be at work early. *Tr.1*, p. 39.

The following morning, Mr. Rock knocked on the victim's room for approximately 10 minutes; he received no respond. *Tr.1*, p. 40. Mr. Rock gave up trying to roust his son and found a screwdriver to jimmy the lock. *Id.* Upon entering the room, he found his son dead. *Tr.1*, p. 41. After suffering the shock of finding his son deceased, Mr. Rock informed his wife and called 911. *Tr.1*, p. 41.

---

[13] Quite inexplicably, the Commonwealth never asked Mr. Rock what his relationship was with the victim; however, this fact is not in dispute.

## Testimony of Jeffrey R. Conner

Mr. Conner is the Franklin County Coroner. *Tr.1*, p. 48. He responded to the scene of the victim's death. *Id.* Upon entering the room, he observed "drug paraphernalia" hear the body. He and the police department initiated an investigation into the cause of death. *Tr.1*, p. 49 – 50. Coroner officials photographed the scene. *Tr.1*, pp. 50 – 51. A number of photographs were admitted into evidence. *Tr.1*, pp. 51, *et seq*; see also Commonwealth's Exhibits 6 – 36. Based upon the Coroner's investigation of the scene, it appeared the victim died in the same position he was found. *Tr.1*, pp. 55 – 57. The investigation of the room also revealed an area where it appeared controlled substances were prepared for injection. *Tr.1*, p. 55; 58. Mr. Conner explained the drug paraphernalia to the jury in the context of a suspected heroin overdose. *Tr.1*, pp. 58 – 60.

The Coroner arranged for the removal of the body from the scene. *Tr.1*, p. 60. He arranged for a forensic autopsy, which would include a complete examination of the victim's body. *Tr.1*, pp. 59 – 60. The Coroner relies heavily on the results of the forensic autopsy to issue his ruling on the cause and manner of death. *Tr.1*, p. 61. After reviewing the evidence and the autopsy

results, the Coroner ruled the cause of death was mixed-substance toxicity and the manner of death was accidental overdose. *Tr.1*, pp. 62 – 63; *see also* Commonwealth's Exhibit 37.

<u>Testimony of Nadine Koenig</u>

Ms. Koenig is employed by Health Network Laboratories as a technical specialist. *Tr.1*, p. 76. She has been employed at Health Network Laboratories for thirty (30) years in various capacities including technologist, certifying scientist, lead tech, and manager. *Id.* She holds a bachelor of science in biology from Shippensburg University, a bachelor of science in medical technology from Shippensburg University, is a certified toxicological chemist by the National Registry of Certified Chemists, and a member of the Society of Forensic Toxicologists. *Tr.1*, pp. 76, 79. She has experience in analyzing bodily fluids since the beginning of her thirty (30) year career, and has conducted thousands of individual fluid analyses. *Tr.1*, p. 77. This court held her to be an expert in the field of forensic toxicology. *Tr.1*, p. 79.

The victim's blood was examined by Joann Sell at Health Network Laboratories; Ms. Sell had since retired. *Tr.1*, p. 80 – 81; *see also* Commonwealth's Exhibit 39. The parties stipulated to the

15

admission of Ms. Sell's report without the need for her to testify.[14] *Tr.1*, p. 81. The victim's blood contained Codeine, morphine, Clonazepam, 7-Aminoclonazepam, Marijuana (THC), 11-Hydroxy Delta-9 THC, and Carboxy-Delta 9 THC. Tr.1, pp. 83 – 84. 6-Monoacetylmorphine was in the victim's urine. *Tr.1*, p. 84. 6-Monoacetylmorphine is a specific metabolite of heroin.[15] *Tr.1*, p. 84. Because of the presence of 6-Monoacetylmorphine in the victim's urine, the victim had consumed heroin. *Tr.1*, pp. 86 – 87.

There was one-thousand-three-hundred-ten (1,310) nanograms per milliliter of morphine in the victim's blood; there was one-thousand-sixty (1,060) nanograms per milliliter of 6-Monoacetylmorphine in the victim's urine. *Tr.1*, p. 83. Heroin metabolizes into 6-Monoacetylmorphine within one (1) to six (6) minutes. *Tr.1*, p. 85. 6-Monoacetylmorphine metabolizes into morphine in about twenty (20) minutes. *Tr.1*, p. 85. Due to these high metabolism rates, it is not uncommon to find morphine in the blood but not 6-Monoacetylmorphine. *Tr.1*, p. 86.

---

[14] At the time Ms. Sell conducted the testing and generated her report, Ms. Koenig was training to replace Ms. Sell. *Tr.1*, p. 83. Ms. Koenig took over Ms. Sell's position in 2015. *Id.*
[15] Heroin's scientific name is Diacetylmorphine. *Tr.1*, p. 84. In the human body, Diacetylmorphine metabolizes into 6-Monoacetylmorphine, which in turn metabolizes into morphine. *Tr.1*, pp. 84 – 85.

There is no therapeutic level in the literature for morphine. *Tr.1*, p. 89. It is the individual's tolerance for the substance and medical purpose for its administration (pain relief) that govern its use. *Id.* However, there are toxic and fatal levels of morphine in the literature, and they overlap. *Id.* The literature establishes fatalities from morphine anywhere from two-hundred (200) nanograms per milliliter to two-thousand-three-hundred nanograms per milliliter. *Id.* However, there are some reported cases of fatalities with as little as thirty (30) nanograms per milliliter to as high as five-thousand (5,000) nanograms per milliliter of morphine in the victim's blood. *Tr.1*, p. 90.

<u>Testimony of Dr. Michael Johnson</u>

Dr. Johnson is employed by Health Network Laboratories and Forensic Pathology Associates. *Tr.1*, p. 120. He is a medical forensic pathologist and neuropathologist. *Id.* He holds both a medical degree and a Ph.D. in neuroscience. *Tr.1*, pp. 120 – 21. At the time of his testimony, he had performed between two and three thousand autopsies. *Tr.1*, p. 121. This court found him to be an expert in the field of forensic pathology. *Tr.1*, p. 122. Dr. Johnson

performed the autopsy on the victim and generated a report with his findings. *Tr.1*, p. 123; Commonwealth's Exhibit 43.

Dr. Johnson educated the jury on the process of conducting an autopsy to determine a cause of death. *Tr.1*, pp. 124 – 26. After conducting the autopsy on the victim in this case, Dr. Johnson formed the opinion that the cause of death was mixed substance toxicity. *Tr.1*, p. 127. His opinion was to a reasonable degree of medical certainty. *Tr.1*, p. 127.

As Dr. Johnson explained to the jury the meaning of mixed substance toxicity. *Tr.1*, pp. 127 – 28. Based upon Dr. Johnson's evaluation of the toxicological testing results, he concluded that the victim abused heroin. *Tr.1*, pp. 130 – 31. In terms of causing the victim's death, Dr. Johnson found the opiates in the victim's system, of all the substances present, to be "most concerning." *Tr.1*, p. 132. On this concern, the Commonwealth posed the following question:

> COMMONWEALTH: So then let me just give a hypothetical, Doctor. If there was evidence tending to prove that [the victim] met with someone prior to their death, obtained heroin from

18

them, brought it home, used it and you've done the autopsy, you've seen the toxicology, **would you confirm to me that the heroin is a direct and substantial factor in bringing about that person's death?**

DR. JOHNSON: **Yes.**

*Tr.1*, p. 133 (emphasis added).

### Testimony of Detective Jason Taylor

Detective Taylor is employed by the District Attorney as a member of the Franklin County Drug Task Force. *Tr.1*, p. 151. Det. Taylor holds associate and bachelor's degrees in criminal justice. *Tr.1*, p. 152. He has been a police officer since 1997, and primarily assigned to narcotics investigations for twenty-two years. *Tr.1*, pp. 151 – 52. Det. Taylor received training from the United States Coast Guard, the Drug Enforcement Administration, the Federal Bureau of Investigation, and the Pennsylvania Office of the Attorney General. *Tr.1*, p. 152. He personally investigated approximately one-thousand (1,000) drug cases; he has been involved in approximately two-thousand (2,000) drug investigations. *Tr.1*, p. 153. At the request of the Commonwealth and without

19

objection from the Defendant, this court found Det. Taylor to be an expert in the area of drug investigations and trafficking of controlled substances in Franklin County. *Tr.1*, p. 156.

Det. Taylor assisted the Waynesboro Police Department in the investigation of the victim's death. *Tr.1*, p. 157. Det. Taylor explained, based upon his observations and in light of his education, training, and experience, the various pieces of evidence found at the scene of the victim's death. *Tr.1*, pp. 157 – 64. Det. Taylor confirmed the cellular telephone found at the scene belonged to the victim. *Tr.1*, p. 164.

The Commonwealth presented a compact disc containing a download of the contents of the victim's phone. *Tr.*1, p. 165; *see also* Commonwealth's Exhibit 51. The download contained logs of calls and text messages. *Tr.1*, pp. 164 – 65; *see also* Commonwealth's Exhibits 52 & 53.

Det. Taylor noted the heroin packaging at the scene of the victim's death involved the use of a straw to hold the heroin, then melting the ends shut to form a package. *Tr.1*, p. 168. This was a unique method of packaging previously unseen by Det. Taylor in Franklin County. *Tr.1*, pp. 168 – 69. He reviewed the forty-nine

(49) previous heroin investigations that year; none of them involved packaging similar to that found in this case. *Tr.1*, p. 169. Similar items were recovered from the Defendant's apartment. *Tr.1*, p. 176-77; *see also* Commonwealth's Exhibit 56. In Det. Taylor's expert opinion, the straws/materials recovered from the Defendant's apartment matched those items recovered from the scene of the victim's death. *Tr.1*, p. 177. Det. Taylor opined that heroin, unlike most other illicit substances, is in a sense a branded product; users want to make sure what they are purchasing is of the same potency they experienced before. *Tr.1*, p. 180.

Det. Taylor participated in a consensual interception of a telephone call between the Defendant and Christopher Hicks at the outset of the investigation. *Tr.1*, pp. 169 – 70; *see also* Commonwealth's Exhibit 55. The recording was played for the jury. The police also utilized Mr. Hicks to arrange a meeting with the Defendant at a park in Waynesboro. *Tr.1*, p. 177. The Defendant never appeared for the meeting. *Tr.1*, p. 178.

<u>Testimony of Christopher Hicks</u>

Mr. Hicks met the victim through a group of friends; they used heroin to get high together. *Transcript of Proceedings of Jury Trial,*

December 11, 2019 (*Tr.2*), p. 6. The Defendant was part of this group of friends. *Id.* Hicks purchased heroin from the Defendant. *Id.* In fact, Hicks would travel with the Defendant to Baltimore where the Defendant purchased heroin in bulk. *Tr.2*, pp. 7 – 8. The Defendant then sold the heroin to "buyers" upon returning to Franklin County. *Tr.2*, p. 8. The Defendant gave heroin to Hicks in exchange for taking him to Baltimore and also for arranging drug deals. *Tr.2*, p. 8.

Hicks introduced the victim to the Defendant. *Tr.2*, p. 10. The victim was looking to trade his Subutex pills for heroin. *Id.* Hicks was aware the Defendant was looking to purchase Subutex pills and had heroin to sell. *Id.* Hicks communicated with the Defendant by phone; the phone belonged to the Defendant's girlfriend, Laura Jewel. *Tr.2*, p. 11. Hicks also communicated with the victim via phone. *Tr.2*, p. 11.

On July 21, 2014, Hicks arranged a meeting between the Defendant and the victim. *Tr.2*, pp. 12 – 13. Hicks spoke with the victim by phone and they discussed the victim's desire to trade Subutex for heroin. *Tr.2*, p. 14. The victim and Hicks met with the Defendant and the victim exchanged heroin for Subutex and cash;

22

this was detailed in a number of text messages between the victim and Hicks. *Tr.2*, pp. 15 – 18; *see also* Commonwealth's Exhibits 52 & 53.

The following day, July 22, 2014, the victim asked Hicks to get him some heroin. *Tr.2*, pp. 18 – 19. Hicks advised the victim to go directly to the Defendant since they had met the day before. *Id.* Later on, Hicks was at the Defendant's home; he was often there.[16] *Tr.2*, pp. 23 – 24. Hicks texted the victim and advised him he was not going to be the middleman for the heroin deal; Hicks advised the Defendant of the same thing. *Tr.2*, p. 24. Hicks did not want to be involved since he was not receiving any heroin in return. *Tr.2*, p. 24 – 25. He told the victim to contact the Defendant directly. *Tr.2*, pp. 26 – 27.

Immediately after this, the Defendant had communication with the victim. *Tr.2*, pp. 29 – 30. The Defendant advised Hicks that he was going to meet the victim. *Tr.2*, p. 30. The Defendant left and Hicks remained at the Defendant's residence. *Tr.2*, p. 30 – 31. When the Defendant returned, Hicks left and returned home. *Tr.2*,

---

[16] Hicks later testified that he, the Defendant, and the Defendant's girlfriend were getting high at this time. *Tr.2*, p. 29.

p. 31. Before Hicks left, the Defendant commented that the victim looked "messed up." *Tr.2*, p. 37.

Hicks was familiar with how the Defendant packaged heroin. *Tr.2*, p. 31. The Defendant used aluminum foil or straws. *Id.* Hicks received heroin in such packaging from the Defendant in the past. *Id.* Although Hicks did not see the Defendant package the heroin he delivered to the victim that night, Laura Jewell told Hicks the Defendant was using straws. *Tr.2*, p. 35.

The following day, police detectives arrived at Hicks' residence. *Tr.2*, p. 37. Hicks agreed to go to the police station for an interview. *Tr.2*, pp. 37 – 38. He provided a written statement to the police regarding his knowledge of the victim's dealings with the Defendant the evening before. *Tr.2*, pp. 39 – 40; *see also* Commonwealth's Exhibit 57.

Hicks agreed to conduct the consensual electronic intercept of a phone call with the Defendant. *Tr.2*, pp. 41 – 42. Hicks confirmed that it was the Defendant on the recorded phone call. *Tr.2*, p. 43; *see also* Commonwealth's Exhibit 53. Hicks also tried to get Laura Jewell to meet him at a park. *Tr.2*, p. 44. Jewell did not appear. *Tr.2*, pp. 44 – 45. Hicks denied selling the heroin to

24

the victim and denied giving anything to the victim on the night he died. *Tr.2*, p. 45.

## Testimony of Albert Lattanzi

Mr. Lattanzi is employed by the Pennsyvlania State Police as a forensic science supervisor. *Tr.2*, p. 81. Without objection, Mr. Lattanzi was found to be an expert in the area of drug identification. *Tr.2*, p. 83.

Mr. Lattanzi analyzed evidence gathered from the scene of the victim's death for the presence of controlled substances; he thereafter generated a written report detailing his findings. *Tr.2*, p. 85; *see also* Commonwealth's Exhibit 62. Several plastic packets were analyzed and found to contain heroin. *Tr.2*, pp. 86 – 87. No other controlled substances were found in those plastic packets. *Tr.2*, p. 94.

## Testimony of Gail Miller

In 2014, Ms. Miller was the manager of several properties in Waynesboro. *Tr.2*, p. 95. One of those properties was the residence located at 147 West North Street. *Id.* Laura Jewell was the lessee of that residence in July 2014. *Tr.2*, p. 98. The Defendant was not a lessee and was not an approved resident on the lease. *Tr.2*, p. 98.

25

In late August 2014, Ms. Miller received a call from the Children and Youth Service; they asked whether she knew where Jewell's children were. *Tr.2*, p. 99. Ms. Miller went to the residence and looked in the window. *Id.* It appeared "everything was gone." *Id.* She then initiated eviction proceedings; eventually she obtained an order of possession. *Tr.2*, pp. 100 – 01.

At some point thereafter, Detective Travis Carbaugh made contact with Ms. Miller. *Tr.2*, p. 101. He requested permission to search the residence. *Id.* Ms. Miller granted permission to search. *Tr.2*, pp. 101 – 02; *see also* Commonwealth's Exhibit 60.

### Testimony of Laura Jewell

Laura Jewell was the former girlfriend, and current friend, of the Defendant. *Tr.2*, p. 106. She remained closed to the Defendant at the time of trial. *Tr.2*, pp. 106 – 07. At the time of this incident, Jewell and the Defendant were romantically involved and living together at the 147 North West Street residence. *Tr.2*, p. 108. In addition to Jewell and the Defendant, five (5) minor children resided in the household.

At the time, neither she nor the Defendant was employed. *Tr.2*, p. 108. Jewell received $1,200.00 per month in child support.

*Tr.2*, pp. 108 – 09. None of the five (5) children were employed. *Tr.2*, pp. 108 – 09. Their monthly rent was $600.00. *Tr.2*, p. 110. Jewell received "help" with paying her electric and grocery bills. Jewell was the only source of income for the household. *Tr.2*, p. 111.

Jewell denied the Defendant was a heroin dealer; she also denied that he would leave the house with her cell phone. *Tr.2*, pp. 111 – 12. She confirmed Hicks was "dealing" heroin, but more as a "middleman." *Tr.2*, p. 112. Hicks would receive some heroin in exchange for setting up drug deals. *Tr.2*, p. 112.

On July 22, 2014, Jewell was suffering from heroin withdrawal. *Tr.2*, p. 114. As a result, her memory of that evening's events was "hazy." *Tr.2*, p. 113. She recalled wanting to not go back to using heroin, that she wanted Subutex instead, that Hicks and the Defendant left the residence that evening, and that they were gone for less than an hour. *Tr.2*, p. 115. The following day, the Defendant told Jewell that he had met with the victim the night before. *Tr.2*, p. 116.

After Hicks called the Defendant the following day, the Defendant was concerned about the victim's death impacting

"problems [the Defendant had] in York County." *Tr.2*, p. 117. The Defendant and Jewell decided to flee the area. *Tr.2*, p. 118. They essentially left without packing anything of significance, fleeing to the State of Maryland. *Tr.2*, pp. 117 – 18. The Defendant was arrested in Maryland approximately a year later; at the time of his arrest, both Jewell and her aunt[17] lied to the police about the Defendant's whereabouts. *Tr.2*, pp. 120 – 23.

## Testimony of Detective Travis Carbaugh

Det. Carbaugh was employed at the Waynesboro Police Department and responded to the scene of the victim's death. *Tr.2*, pp. 151 – 53. Waynesboro Police officers, the Franklin County Coroner's Office, and the victim's family were on scene when Det. Carbaugh arrived. *Tr.2*, p. 153.

Part of Det. Carbaugh's investigation involved analyzing the contents of the victim's phone. *Tr.2*, p. 153. Det. Carbaugh determined that the victim had contacted both Hicks and the Defendant prior to his death. *Tr.2*, p. 153 – 55. Det. Carbaugh reviewed a number of text messages and incoming/outgoing phone

---

[17] The Defendant and Jewell were residing with Jewell's aunt at the time. Tr.2, p. 122.

28

calls between Hicks, the Defendant,[18] and the victim for the jury. *Tr.2*, p. 155 – 66. These texts/calls established the victim communicated with the Defendant to arrange a trade of Subutex/Suboxone and cash in exchange for heroin. *Tr.2*, p. 155 – 66.

Det. Carbaugh also searched the Defendant's residence at 147 West North Street, after receiving permission from Ms. Miller. *Tr.2*, p. 167. It appeared that whoever was living there "had just up and left." *Id.* During his search, Det. Carbaugh located "several pieces of plastic straw that were similar to the ones that [they] found in [the victim's] bedroom that contained heroin, the residue." *Tr.2*, p. 169. Some of the straw pieces had burnt ends, and several larger pieces appeared to have their ends cut off. *Tr.2*, p. 170. Det. Carbaugh also recovered a piece of mail addressed to the Defendant at the 147 West North Street address. *Tr.2*, p. 173.

<u>Testimony of Cameron Truett</u>

Cameron Truett is the Defendant's son. *Transcript of Proceedings of Jury Trial (Tr.3)*, December 12, 2019, p. 6. He lived with the Defendant in 2014. *Id.* Cameron identified several items

---

[18] The phone number in question belonged to Jewell; per Hicks, the Defendant utilized Jewell's phone to conduct drug transactions. *Tr.2*, p. 11.

that were found in his room by the police. *Tr.3*, p. 10 – 11. He acknowledged that he was a heroin addict at the time. *Tr.3*, p. 11. He obtained heroin from Hicks, and it was packaged in bags "sometimes" but "mostly" it was in straw containers. *Tr.3*, p. 12. He denied ever using heroin with the Defendant or Jewell. *Tr.3*, p. 13.

### Testimony of Keanna Truett

Keanna Truett is the Defendant's daughter. *Tr.3*, p, 25. She lived with the Defendant at the time in question. *Tr.3*, p. 26. She identified Cameron's room as the room where the police found the heroin paraphernalia. *Tr.3*, pp. 29 – 30.

Keanna was present on the night in question. *Tr.3*, p. 30 – 31. She saw Hicks arrive at the residence; Hicks asked where the Defendant was. *Tr.3*, p. 31. Keanna told him the Defendant was upstairs. *Tr.3*, p. 31. Hicks went upstairs. *Tr.3*, p. 31. Keanna then saw the Defendant and Hicks leave together; they were not gone very long and both returned to the house. *Tr.3*, p. 31. Hicks then left the residence. *Tr.3*, p. 31.

## Testimony of the Defendant

The Defendant and Jewell began a romantic relationship in early 2014. *Tr.3*, p. 48. They moved in together in late February 2014. *Tr.3*, p. 49. At some point thereafter, the Defendant was incarcerated. *Tr.3*, p. 49. Upon his release, he and Jewell moved to the 147 West North Street address in Waynesboro. *Tr.3*, p. 49.

During this time, the Defendant was addicted to opiates; specifically, the Defendant had progressed to consuming heroin. *Tr.3*, p. 52. He met Hicks around late June 2014; Hicks was a friend of Jewell's. *Tr.3*, pp. 53 – 55. The Defendant bought heroin from Hicks. *Tr.3*, p. 54. The Defendant did occasional work for "a friend who was in the paving business" but was otherwise unemployed at the time in question. *Tr.3*, p. 59.

The Defendant acknowledged traveling to Baltimore with Hicks "one time" to purchase heroin; the Defendant and Hicks used Jewell's vehicle. *Tr.3*, pp. 60 – 61. The purpose was for Hicks to purchase the heroin; the Defendant denied he went to obtain heroin. *Tr.3*, p. 61. The Defendant also had a probation violation hearing in the middle of July 2014 in York County. *Tr.3*, pp. 61 – 62. The Defendant did not follow up with his probation officer and

the court in York County; he was concerned that this failure would lead to a warrant for his arrest. *Tr.3*, p. 63.

On July 21, 2014, the Defendant was looking to buy Subutex and possibly heroin. *Tr.3*, p. 65. The Defendant communicated with Hicks about purchasing these substances; Hicks advised him that he knew someone willing to sell Subutex. *Id.* Hicks took the Defendant to meet the victim in a Kmart parking lot. *Id.*

Hicks conducted the deal with the victim and then introduced the victim to the Defendant. *Tr.3*, p. 66. The Defendant bought four Subutex pills from the victim through Hicks that day. *Id.* The victim offered to "front" the Defendant more pills; the Defendant declined. *Id.* The Defendant overheard the victim and Hicks discussing a heroin deal, but he did not see Hicks give any heroin to the victim that day. *Id.* The victim offered to give the Defendant his phone number, but the Defendant said he could get it from Hicks if he needed it.[19] *Tr.3*, pp. 67 – 68.

The following day, the Defendant and Jewell were struggling with wanting to use heroin. *Tr.3*, p. 69. Even though they had the Subutex from the day before, the Defendant suggested purchasing

---

[19] The Defendant got the victim's phone number from Hick's upon returning to his residence that evening. *Tr.3*, p. 71.

"a couple bags" of heroin. *Id.* Jewell argued with the Defendant, as she did not want to give in to using heroin. *Id.*

Later that same day, the Defendant messaged the victim about purchasing Subutex. *Tr.3*, p. 71. The victim responded proposing a trade of Subutex for heroin. *Id.* The Defendant did not know how to respond; he did not have any heroin, and if he did, he and Jewell would have used it. *Tr.3*, pp. 71 – 72.

A bit later, Hicks arrived at the house and the Defendant spoke with him about the victim's offer to trade Subutex for heroin. *Tr.3*, p. 72. At that point Hicks "basically took over from there." *Id.* Hicks used Jewell's phone to communicate with the victim and arrange for the Defendant to purchase the Subutex with cash, which cash the victim would use to purchase heroin from Hicks. *Tr.3*, p. 72.

Hicks and the Defendant left the residence and walked to a carwash nearby. *Tr.3*, pp. 74 – 75. The victim was already present when they arrived. *Tr.3*, p. 75. The Defendant gave a "nod" to the victim and Hicks walked up to the victim's car. *Tr.3*, p. 75. Prior to arriving at this location, the Defendant had given Hicks money.

*Tr.3*, p. 76. He did not give Hicks heroin. *Tr.3*, p. 76. He believed Hicks had heroin on his person. *Tr.3*, p. 76.

The Defendant did not engage the victim in discussion, but overheard the victim talking to Hicks. *Tr.3*, pp. 76 – 77. He overheard the victim tell Hicks that he had already sold the Subutex. *Tr.3*, p. 77. After he heard this, the Defendant began to "drift" away from the car; he did not hear any more of the conversation. *Tr.3*, p. 77.

After five or ten minutes, Hicks and the Defendant returned to the Defendant's residence. *Tr.3*, p. 78. The Defendant bought two bags of heroin from Hicks at this time. *Id.* Hicks "hung out for a little bit" and then left the Defendant's residence. *Tr.3*, p. 78.

The Defendant received the phone call from Hicks the following morning informing him of the victim's death; prior to getting the call, the Defendant injected heroin and was "dazed." *Tr.3*, pp. 88 – 89. He denied that, during that recorded phone call, he ever agreed that he was involved or responsible for the victim's death. *Tr.3*, p. 92. He denied ever selling heroin to the victim. *Tr.3*, p. 92.

The Defendant discussed the phone call with Jewell. *Tr.3*, p. 93. The Defendant was concerned about a warrant being issued in York County for his probation issues. *Id.* They decided to move to Maryland to live with Jewell's aunt. *Id.* The move was not because of the victim's death. *Tr.3*, pp. 94 – 95. The Defendant acknowledged his numerous prior convictions for crimes of dishonesty. *Tr.3*, p. 99 – 100.

All this evidence, viewed in the light most favorable to the Commonwealth, leads us to conclude the Commonwealth presented sufficient evidence as to causation. Dr. Johnson's uncontroverted expert opinion was the victim died from mixed substance toxicity, the heroin in his system was the "most concerning" finding, and that it played a direct and substantial cause in bringing about death.

As to the underlying delivery of heroin, again in the light most favorable to the Commonwealth, the evidence is clearly sufficient. The jury was free to believe Hicks' testimony or reject it, just as they were free to accept the Defendant's testimony or reject it. Further, the voluminous text messages admitted into evidence corroborated Hicks' testimony and discredited the Defendant's assertions that it

was Hicks actually utilizing Jewel's telephone to send/receive the damning text messages to/from the victim, and not himself. The Commonwealth's cross-examination of the Defendant on this precise point is illuminating. *See Tr.3*, pp. 113 – 23; 127 – 37. It is this court's considered opinion that there was sufficient evidence presented to support the verdict of guilt as to Drug Delivery Resulting in Death.

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA – FRANKLIN COUNTY

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | CRIMINAL ACTION |
| | : | |
| | : | CP-28-CR-000865-2015 |
| V. | : | |
| | : | **JUDGE JEREMIAH D. ZOOK** |
| | : | |
| **BRADLEY JAY TRUETT,** | : | |
| | : | |
| DEFENDANT | : | |

## ORDER

**NOW**, this 27th day of October, 2020, upon the forgoing *Opinion*, **IT IS HEREBY ORDERED** that the Franklin County Clerk of Courts is directed to transmit the forgoing *Opinion sur Pa.R.A.P. 1925(a)* and the record of these proceedings to the Prothonotary of the Superior Court of Pennsylvania pursuant to Pa.R.A.P. 1931(c).

Notice of this judgment shall be given pursuant to Pa.R.Crim.P. 114.

By the Court,

JUDGE JEREMIAH D. ZOOK

**The Clerk shall give notice to:**
District Attorney's Office (J. Faust, Esq.) – Counsel for the Commonwealth
Public Defender's Office (M. Palermo, Esq.) – Counsel for the Defendant

**BRADLEY JAY TRUETT**                           **Case No.  865-2015**


On October 28, 2020, I Barbara E. Black served a copy of the *Order* signed on October 27, 2020 by the Honorable Jeremiah D. Zook and filed on October 28, 2020, on the following persons by the following method:


**Interoffice:**

Franklin County
District Attorney's Office



**U.S. Mail:**

Michael O. Palermo, Jr., Esquire
PALERMO LAW OFFICES
3300 Trindle Road, Suite 2
Camp Hill, PA  17011-4432


*Barbara E. Black*
_____
Deputy Clerk of Courts